HELICOPTER ASSOCIATES, INC., ET AL. *v.* CITY OF STAMFORD
(12650)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

---

Argued October 3—decision released December 30, 1986

*Frank H. D'Andrea, Jr.,* with whom was *Brian D. Rosenfeld,* for the appellants (plaintiffs).

*James R. Fogarty,* with whom, on the brief, was *Andrew P. Nemiroff,* for the appellee (defendant).

DANNEHY, J. This appeal raises questions of whether state statutes governing aeronautics preempt a certain municipal zoning regulation and whether a use of property prior to the enactment of the regulation constituted a valid, nonconforming use. The trial court

found that the state had not preempted the field and that a valid nonconforming use did not exist on the effective date of the regulation. We find error in part and remand the case for further proceedings.

The facts before the trial court were as follows. The plaintiff, Helicopter Associates, Inc. (HAI), is a Connecticut corporation which was created to provide helicopter transportation service to Connecticut area businesses and residents. The plaintiff, Mercedes Plaza Enterprises (MPE), is the owner of a tract of land in the city of Stamford. In the fall of 1979, HAI and MPE reached an oral agreement whereby HAI could use the MPE site for the landing and taking off of helicopters. During the following year, HAI purchased several helicopters, hired two full-time pilots, and began to solicit business from the regional corporate community. Meanwhile, MPE made various improvements at the site including shortening a cyclone fence, paving the site, painting helicopter landing lines thereon, and installing a directional windsock. In July of 1980, HAI applied for a license from the state department of transportation (DOT), bureau of aeronautics, to operate a commercial heliport at the MPE site. Such a license is required by statute if an area is expected to be used for more than thirty-six landings and takeoffs per year. See General Statutes § 13b-46.

The events leading up to this action began in the fall of 1980. On September 9, 1980, the zoning board of the defendant, city of Stamford, amended its zoning regulations to delete from the land use schedule as a permitted use the category of "aeroplane field, hangar or ramp." The parties agree that this category included helicopter facilities. The Stamford zoning regulations contain a provision which states that any use of land legally existing at the time of an amendment to the regulations is deemed to be a nonconforming use, and that such use may be continued but may not be

extended or expanded. Stamford Zoning Regulations, art. IV, § 10 (A). As of September 9, 1980, the effective date of the amendment to the regulations, HAI had performed ten takeoffs and landings of helicopters from the MPE site, but had not yet received the state license which would have allowed it to make more than thirty-six flights per year. During the several months following the enactment of the amendment, HAI continued to conduct flights from the site without receiving any complaints that this use violated local regulations or ordinances.

On May 26, 1981, after holding a hearing, reviewing HAI's application and inspecting the MPE site, the commissioner of the DOT issued HAI a commercial heliport license, effective June 1, 1981. The license stipulated that the plaintiffs must comply with "[a]ll federal, state and municipal statutes, ordinances and regulations . . . ." Apparently in response to the granting of the license, the Stamford board of representatives called a special meeting on May 30, 1981. At the meeting, the board adopted an ordinance which prohibits any private or commercial landing facility in Stamford unless a permit is granted by the Stamford zoning board.

The plaintiffs then commenced this action against the city of Stamford seeking, inter alia, a declaratory judgment that the ordinance passed on May 30, 1981, was invalid on constitutional and other grounds and an injunction prohibiting enforcement of the ordinance against the plaintiffs.[1] The defendant, by way of counterclaim, alleged that the plaintiffs' use of the MPE site violated the amendment to the zoning regulations, effective September 9, 1980, which deleted the cate-

---

[1] The plaintiffs' complaint is in three counts. The third count alleges a due process violation based on the method by which the city of Stamford enacted the ordinance. At trial, the plaintiffs proceeded only on the first two counts and reserved the third count for trial at a later date.

gory of "aeroplane field, hangar or ramp" from the land use schedule. In addition, the defendant alleged that the plaintiffs' proposed use would constitute an unlawful extension or expansion of any nonconforming use of the property as a heliport. The plaintiffs then filed a special defense asserting that the state of Connecticut had preempted the field of land use with respect to the design, establishment, construction, extension, operation, improvement, repair and maintenance of airports, restricted landing areas or other navigational facilities thereby prohibiting regulation of the heliport by the defendant. This special defense was subsequently denied by the defendant.

The evidence before the trial court consisted mainly of documents, a stipulation of facts and the testimony of two individuals. From the pleadings and evidence presented, the trial court concluded that the dispositive issues of the case were actually those raised in the counterclaim and the special defense. As to these issues, the court found that the state had not preempted the control and use of heliports to the exclusion of local regulation and that the plaintiffs did not have a nonconforming use of the MPE site as a commercial heliport on September 9, 1980, the effective date of the amendment. The court also concluded that because the plaintiffs had flown only five commercial flights and seventeen total flights for the year, allowing the site to be used for an unlimited number of flights would constitute an expansion or change in character of any existing use, in violation of article IV, § 10 (A), of the Stamford zoning regulations. Judgment was thereafter rendered for the defendant and the plaintiffs were enjoined from using the MPE site for helicopter takeoffs and landings. In response to the plaintiffs' motion for further articulation and rectification, the court again declined to rule on the constitutionality of the ordinance passed on May 30, 1981.

The plaintiffs have appealed from the decision of the trial court claiming six grounds of error. The first three grounds involve the issues of preemption and nonconforming use, while the latter three pertain to the trial court's refusal to grant the declaratory and injunctive relief sought by the plaintiffs and its granting of injunctive relief in favor of the defendants. We find error in the trial court's finding that the plaintiffs did not possess a nonconforming use under the Stamford zoning regulations and remand this case for further proceedings to determine the validity of the ordinance passed on May 30, 1981.

## I

### PREEMPTION

We must first consider the issue of preemption, for if the state has indeed preempted the field of aeronautics, the challenged amendment to the Stamford zoning regulations would be invalid and any discussion of its application to the plaintiffs would be moot. All parties agree that the law of preemption is clearly set forth in *Shelton* v. *Commissioner,* 193 Conn. 506, 479 A.2d 208 (1984). In that case, we stated that " '[a] local ordinance is preempted by a state statute whenever the legislature has demonstrated an intent to occupy the entire field of regulation on the matter . . . or . . . whenever the local ordinance irreconcilably conflicts with the statute. . . . Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives. . . .' " (Citations omitted.) Id., 517, quoting *Dwyer* v. *Farrell,* 193 Conn. 7, 12–14, 475 A.2d 257 (1984).

The trial court in the present case held that no preemption had occurred even though it acknowledged that the legislature has granted to the commissioner

of the department of transportation broad powers over aeronautics. See General Statutes §§ 13b-39 through 13b-50; see generally General Statutes, title 15, c. 266. The court explained that the plaintiffs had not referred to any statutes which indicated a legislative intent to usurp local control of land use. The plaintiffs vigorously contest this finding, arguing that they had indeed cited numerous statutes evidencing such an intent.[2] We have carefully reviewed those statutes referred to by the plaintiffs and agree with the trial court that they do not reveal a legislative intent to vest exclusive control over the establishment of private aeronautical facilities in the state.

The provisions in our statutes relating to aeronautics begin by granting to the commissioner jurisdiction over and responsibility for "aeronautics" in the state. General Statutes § 13b-39. The term "aeronautics" is defined in General Statutes § 15-34 to include "the design, establishment, construction, extension, operation, improvement, repair or maintenance of airports, restricted landing areas or other air navigational facilities."[3] Significantly, the word "location" is missing from this definition. Cf. *Garden State Farms, Inc.* v. *Bay*, 77 N.J. 439, 390 A.2d 1177 (1978). Under General Statutes § 13b-42 (a) the commissioner is vested with the "entire charge, control, operation and management" of air facilities owned or leased by the state. Subsequent provisions set forth the procedure whereby the commissioner may acquire a municipal air facility or land within the state for use as a state air facility. See General Statutes §§ 13b-42 (c) and (d), 13b-44. Another statute explains the procedure to be followed when a

[2] The plaintiffs argue that in their trial brief they cited the following statutes to indicate a legislative intent that the state is to have exclusive power to govern the use of land for aeronautical purposes within its borders: General Statutes §§ 13b-39, 13b-43, 13b-44, 13b-46, 15-34 (1), 15-38, 15-41.

[3] Public Acts 1985, No. 85-262, inserted the term "heliports" after "airports." Neither party has argued that prior to the act, the commissioner lacked authority over heliports.

municipality, acting alone or jointly with another municipality, wishes to establish an air facility. See General Statutes § 13b-43. Arguably, these comprehensive provisions may govern the entire field of the creation of *state* and *municipal* air facilities. See *East Haven* v. *New Haven,* 159 Conn. 453, 271 A.2d 110 (1970).

The plaintiffs, however, seek to establish a *private* heliport and under the few statutory provisions addressing privately owned air facilities; see General Statutes §§ 13b-46 through 13b-49; the commissioner performs essentially a licensing function. The commissioner is authorized under § 13b-46[4] to issue certificates of approval and licenses (the latter being required if more than thirty-six flights are anticipated) to any person or municipality wishing to construct an air facility. Subsequent provisions list the criteria the commissioner must consider in determining whether to issue a certificate or license and provide for a public hearing prior to the commissioner's determination. See General Statutes §§ 13b-47, 13b-48.[5] Nowhere in these provisions is there any indication that the legis-

[4] "[General Statutes] Sec. 13b-46. CERTIFICATE OF APPROVAL. LICENSES. (a) The commissioner is authorized to approve airports, restricted landing areas, and other air navigation facilities in accordance with regulations adopted by him. Any municipality or person acquiring property for the purpose of constructing or establishing an airport or restricted landing area shall, prior to such acquisition, apply to the commissioner for a certificate of approval of the site selected and the general purpose or purposes for which the property is to be acquired, to insure that the property and its use shall conform to minimum standards of safety and shall serve the public interest. Any proposed airport, restricted landing area or other air navigation facility at which more than thirty-six landings and takeoffs are expected to be made by aircraft in any year shall be approved by the commissioner before it shall be licensed to be used or operated for such year. The commissioner shall make no charge for approval certificates of proposed property acquisition for airport or restricted landing area purposes . . . ." Public Acts 1985, No. 85-262, added the word "heliports" after the word "airports" and the word "heliport" after the word "airport" in the three places where the latter word appears.

[5] "[General Statutes] Sec. 13b-47. CRITERIA FOR APPROVAL. In determining whether he shall issue a certificate of approval or license for the use or operation of any proposed airport or restricted landing area, the com-

lature intended to preempt the field of aeronautics with respect to private as opposed to state or municipally owned air facilities. On the contrary, language in § 13b-46 (a) indicates that the commissioner's role in licensing private air facilities is merely "to insure that the property and its use shall conform to minimum standards of safety and shall serve the public interest."

In *Shelton* v. *Commissioner*, supra, 518, we held that the Solid Waste Management Services Act; General Statutes §§ 22a-257 through 22a-281; preempted local zoning regulations governing solid waste disposal. That act, however, clearly stated the legislative policy that "solid waste disposal and resources recovery facilities and projects are to be implemented either by the state of Connecticut or under state auspices. . . ." General Statutes § 22a-259 (2); *Shelton* v. *Commissioner*, supra. Moreover, the act was based on express legislative findings that "local governments responsible for waste disposal services are becoming hard pressed to provide adequate services at reasonable costs . . . [and] that the development of systems and facilities and the use of the technology necessary to initiate large-scale processing of solid wastes have become a logical and necessary function to be assumed by state government. . . ." General Statutes § 22a-258; *Shelton* v. *Commissioner*, supra.

---

missioner shall take into consideration (1) its proposed location, size and layout, (2) its relationship to the comprehensive long-range master transportation plan and to any other comprehensive plan for statewide and nationwide development, (3) the availability of areas suitable for safe future expansion, (4) the freedom of adjoining areas from obstructions based on a proper glide ratio, (5) the nature of the terrain and of the uses to which the proposed airport or restricted landing area will be put, and (6) the possibilities for future development." In Public Acts 1985, No. 85-427, the legislature deleted the phrase "airport or restricted landing area" and added in its place the phrase "commercial use air navigation facility." The act also created a section "(b)" which listed the criteria to be considered for the establishment of a "private use air navigation facility."

"[General Statutes] Sec. 13b-48. HEARING ON APPLICATION FOR CERTIFICATE OF APPROVAL OR LICENSE. Upon receipt of any application for a cer-

The Connecticut aeronautics statutes contain no such preemptive language. The legislature has instead given municipalities broad powers to enact zoning regulations; see General Statutes § 8-2; and has specifically provided that municipalities "shall have the power to . . . [e]stablish, lay out, construct, reconstruct, alter, maintain, repair, control and operate . . . airports and their accessories . . . ." General Statutes § 7-148 (c) (6) (A) (i). Were we to adopt the plaintiffs' construction of the aeronautics statutes, whereby the state could in effect force a town to allow the establishment of a private air facility, the powers granted to municipalities under titles 7 and 8 would be rendered illusory.

---

tificate of approval of an airport or restricted landing area, or an original license to use or operate an airport, restricted landing area or other air navigation facility, the commissioner shall send notice thereof by registered or certified mail to the chief executive officer or first selectman of the municipality or municipalities in which the proposed airport, restricted landing area or other air navigation facility is proposed to be located. If the applicant, or such municipality within fifteen days after receipt of such notice, requests a public hearing, the commissioner shall set a time and place therefor in the municipality in which the proposed airport, restricted landing area or other air navigation facility is proposed to be situated, at which hearing interested parties shall have an opportunity to be heard. The commissioner may in his discretion hold a public hearing in any case where no such request is made. Notice of any such hearing shall be published by the commissioner in a newspaper of general circulation in such municipality at least twice, the first publication to be at least fifteen days prior to the date of the hearing. Upon the conclusion of such hearing the commissioner shall consider all the relevant evidence and shall issue an order granting or denying such application, written notice of which shall be sent by registered or certified mail to the applicant and to the chief executive officer or the first selectman of the municipality or municipalities in which the proposed airport, restricted landing area or other air navigation facility is to be located. Orders issued pursuant to this section shall comply with the requirements of section 15-66 and shall be subject to appeal as provided in section 15-67." Public Acts 1985, No. 85-262, inserted the word "heliport" after "airport."

The final section pertaining to private air facilities is General Statutes § 13b-49 which allows the commissioner to revoke a license or certificate of approval if the air facility is being used improperly.

Our conclusion that the Connecticut aeronautics statutes do not preempt the entire field of aeronautics to the exclusion of local regulations is consistent with the actions and statements of senior officials of the DOT. The license granted to HAI specifically provides that "[a]ll federal, state and municipal statutes, ordinances and regulations [are] to be complied with." Correspondence from a high ranking DOT official states that "[t]he Department of Transportation cannot and does not ignore established zoning or local ordinances." Other DOT officials echoed this policy.[6]

The plaintiffs also contend that the trial court erred because it failed to consider the second portion of the *Shelton* preemption test, whether there is an irreconcilable conflict between the state statutes and the local enactment. Although the trial judge's memorandum of decision does not indicate whether this aspect of the test was considered, a close analysis of the plaintiffs' claim reveals that it was not necessary to reach it. The plaintiffs argue that an irreconcilable conflict exists because on the one hand, the language and legislative history of titles 13b and 15 of the General Statutes show a clear intent that the field of transportation, including transportation by air, is to be addressed solely by way of a comprehensive statewide program. Under this program, they contend, the commissioner is the only one authorized to issue licenses, and has in fact issued to the plaintiffs a license notwithstanding the defendant's zoning regulations. On the other hand, they point

---

[6] For example, in a letter to Stamford's mayor dated July 10, 1980, the chief executive officer, bureau of aeronautics, stated "[t]he Department of Transportation is soliciting comments from the City of Stamford relating to . . . [the application from HAI], including information as to whether this proposal meets with local zoning regulations and ordinances." Pursuant to this letter, a public hearing was held in Stamford on December 10, 1980, regarding HAI's application. Although a number of individuals present spoke out against the proposed facility, the legality of the plaintiffs' use under the September 9, 1980 amendment does not appear to have been raised or discussed.

out that the legislature has also recognized the need for local power over land use; see General Statutes § 8-2; Stamford Charter § 550; and pursuant to this power, Stamford has amended its regulations to prohibit the use of the plaintiffs' property as a heliport. We have already rejected, as did the trial court, the plaintiffs' initial premise that all aspects of air transportation are to be regulated exclusively by the state. We fail to perceive, therefore, the conflict which the plaintiffs claim necessitates review under the second portion of the *Shelton* test.

## II

### NONCONFORMING USE

Having determined that the amendment to the Stamford zoning regulations has not been preempted by state aeronautics statutes, we next consider the amendment's application to the plaintiffs. The amendment, which became effective on September 9, 1980, deleted from the land use schedule the category of "aeroplane field, hangar or ramp." It is undisputed that helicopter facilities are included in this category. The Stamford zoning regulations also contain a provision that "any . . . use of land . . . legally existing at the time . . . of any amendment [to these Regulations] . . . shall be designated a non-conforming use. Such use may be continued but may not be extended or expanded. . . . " Stamford Zoning Regulations, art. IV, § 10 (A); see also General Statutes § 8-2. The question which emerges from this provision and which arose by virtue of the defendant's counterclaim is whether the plaintiffs possessed a nonconforming use as of September 9, 1980, so that they could continue to use the MPE site as a commercial heliport.

The trial court answered this question in the negative, explaining that the plaintiffs' use of the site was merely "casual." Although it acknowledged that the

area had been paved, landing lines painted, a windsock installed, and that five commercial flights had taken place, the court nonetheless could not find "by any common sense standard" that the site was being used as a commercial heliport at the time the amendment was passed. The plaintiffs contend that this conclusion is clearly erroneous in that the court failed to apply the proper legal test for determining whether a nonconforming use existed. See *Duksa* v. *Middletown,* 192 Conn. 191, 205–206, 472 A.2d 1 (1984); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980). Once this test is applied to the facts of the case, they argue, it is clear the trial court's conclusion was not logically correct. We agree with the plaintiffs' position.

For a use to be considered nonconforming under § 10 (A) of the Stamford zoning regulations and under Connecticut case law, that use must possess two characteristics. First, it must be *lawful* and second, it must be *in existence* at the time that the zoning regulation making the use nonconforming was enacted. *Petruzzi* v. *Zoning Board of Appeals,* 176 Conn. 479, 482–83, 408 A.2d 243 (1979); *Bianco* v. *Darien,* 157 Conn. 548, 558–59, 254 A.2d 898 (1969); *Prospect Gardens Convalescent Home, Inc.* v. *Norwalk,* 32 Conn. Sup. 214, 221–22, 347 A.2d 637 (1975). The legality of the plaintiffs' use of the MPE site as a heliport prior to September 9, 1980, requires little discussion. Until the amendment was passed, heliports were allowed under Stamford zoning regulations in the zone where the MPE site is located. The plaintiffs' use of the site for ten flights was also legal under state law, because a license is only required if over thirty-six flights are to be made per year.[7] See General Statutes § 13b-46.

---

[7] In support of its conclusion that the plaintiffs did not have a nonconforming use, the trial court stated in its memorandum of decision that the plaintiffs failed to satisfy the requirements of § 15-41-29 of the Regulations

The second requirement for a nonconforming use is that the use be *in existence* at the time of the relevant zoning change. See Stamford Zoning Regulations, art. IV, § 10 (A); *Melody* v. *Zoning Board of Appeals,* 158 Conn. 516, 520, 264 A.2d 572 (1969). In several prior decisions we have articulated the test for identifying an existing use. "For there to be an existing use, premises must be so utilized as to be known in the neighborhood as employed for a given purpose. Such utilization combines two factors: (1) the adaptability of the land for the purpose; (2) the employment of it within that purpose. In addition, the use must be actual and not merely contemplated." *Wallingford* v. *Roberts,* 145 Conn. 682, 684, 146 A.2d 588 (1958); see also *Melody* v. *Zoning Board of Appeals,* supra; *DeFelice* v. *Zoning Board of Appeals,* 130 Conn. 156, 161, 32 A.2d 635 (1943). Moreover, we have unequivocally stated that neither the extent, quantity nor quality of the use is prescribed by the "known in the neighborhood" test. *Melody* v. *Zoning Board of Appeals,* supra, 520–21. "The court is not generally required to speculate as to the number of acts or business transactions necessary to constitute an existing use." Id., 521; *Fairlawns Cemetery Assn., Inc.* v. *Zoning Commission,* 138 Conn. 434, 444, 86 A.2d 74 (1952); see also 101A C.J.S., Zoning & Land Planning § 184, pp. 548–50.

Although the trial court in its memorandum of decision cited *Wallingford* v. *Roberts,* supra, it neither dis-

of Connecticut State Agencies. This section sets forth minimum requirements for commercial airports including the necessity of facilities for fuel, drinking water and sanitary toilets. The plaintiffs' failure to comply with all of these regulations two months after the submission of their application is not fatal to their claim of a nonconforming use. These regulations apparently come into play when the commissioner grants a license to an applicant, but need not be satisfied prior to the issuance of a license. In issuing the license to HAI, for example, correspondence from the state bureau of aeronautics states that certain of the requirements set forth in the regulations were waived because of the nature of HAI's license, but others still had to be met.

cussed nor applied the "known in the neighborhood" test which that case stands for. Instead, in concluding that a nonconforming use was not present, the court stated that it could not find by "any common sense standard," that the site was being used as a commercial heliport, and that the plaintiffs' use was merely casual. The court's failure to find a nonconforming use is clearly erroneous when the facts of the case are examined under the test set forth in *Wallingford* v. *Roberts*. The first factor of that test concerns the adaptability of the land for the given purpose. Id. The trial judge found that the site had been paved, that landing lines had been painted, and that a windsock was erected. These facts, coupled with the fact that five commercial flights had occurred prior to the passage of the amendment, lead to the inescapable conclusion that the site indeed had been adapted for use as a commercial heliport.

For a use to be "known in the neighborhood," not only must the premises have been adapted for a given purpose, but the premises must also have been employed within that purpose. Id. The facts of the present case indicate that ten flights had been made as of September 9, 1980, five of which were commercial. The trial court concluded that such a use was "casual" and insufficient to establish a nonconforming use. The test in *Wallingford* v. *Roberts,* however, only requires that the premises *be employed* for the given purpose, the purpose here being the establishment of a commercial heliport. This use clearly occurred here. The test does not require a specific quantity of uses to have been made. *Melody* v. *Zoning Board of Appeals,* supra; *Fairlawns Cemetery Assn., Inc.* v. *Zoning Commission,* supra. In fact, *Melody* and *Fairlawns Cemetery Assn., Inc.,* make clear that the number of times the premises have been used for the given purpose should not be a factor in the court's determination of

whether such use is known in the neighborhood. *Melody* v. *Zoning Board of Appeals,* supra; *Fairlawns Cemetery Assn., Inc.,* v. *Zoning Commission,* supra.

Apart from an analysis under the two prongs of the *Wallingford* v. *Roberts* test, other facts presented to the trial court convince us that the plaintiffs' use of the MPE site as a commercial heliport was known in the Stamford area. As noted above, the area physically had been changed to accommodate helicopter flights, and flights had been made. During one of these flights, DOT commissioner Arthur Powers was flown in to the MPE site and met there by the Stamford mayor. The town of Stamford was notified by a letter to its mayor, dated July 10, 1980, that the state had received HAI's application for a commercial heliport license. Stamford's building official and zoning enforcement officer, James J. Soltire, testified that he was aware helicopter flights were taking place at the MPE site prior to the zoning change and that he considered the plaintiffs' operations to be a nonconforming use. The Stamford zoning board was also aware of the use of the MPE site for helicopter flights prior to September 9, 1980, because Soltire testified that he notified the board of the use by letter. The only reasonable conclusion to be drawn from these facts is that the plaintiffs were operating a commercial heliport, albeit an as yet unlicensed one, as of September 9, 1980, and that this use was known in the Stamford area.

Our conclusion that the plaintiffs had a nonconforming use to operate a commercial heliport on September 9, 1980, does not end our inquiry. The nonconforming use which the plaintiffs possessed on that date allowed them to conduct no more than thirty-six flights per year at the MPE site. The reason for this limit inheres in the definition of a nonconforming use itself. As stated above, a use is nonconforming if it *legally* exists at the time of the zoning change. See Stamford Zoning Regu-

lations, art. IV, § 10 (A); *Petruzzi* v. *Zoning Board of Appeals*, supra, 482. On September 9, 1980, the plaintiffs could not legally perform over thirty-six flights because they had not yet obtained the requisite state license. See General Statutes § 13b-46. Their nonconforming use thus was limited to no more than thirty-six flights per year.

The plaintiffs, however, seek to utilize the MPE site for an unlimited number of flights. Consequently, we must now determine whether such a use would violate the provision of the Stamford zoning regulations which provides that a nonconforming use "may be continued but may not be extended or expanded. . . ." Stamford Zoning Regulations, art. IV, § 10 (A). The trial judge held that even if the plaintiffs had some type of nonconforming use, to allow unlimited flights would constitute a change in the character of the existing use in violation of the nonexpansion clause of § 10 (A). The legality of an extension of a nonconforming use is essentially a question of fact. *Guilford* v. *Landon,* 146 Conn. 178, 183, 148 A.2d 551 (1959). We cannot say that the trial court's conclusion regarding this aspect of the case was clearly erroneous.

We have previously held that a mere increase in the amount of business done pursuant to a nonconforming use is not an illegal expansion of the original use. *Guilford* v. *Landon,* supra; *Salerni* v. *Scheuy,* 140 Conn. 566, 571, 102 A.2d 528 (1954); *DeFelice* v. *Zoning Board of Appeals,* supra, 162. A change in the character of a use, however, does constitute an unlawful extension of the prior use. *Salerni* v. *Scheuy,* supra. In *Salerni* v. *Scheuy,* supra, we affirmed a finding that the granting of a permit to sell all types of liquors at a restaurant which held only a beer permit would be a change in the character of the nonconforming use. We explained that "[t]he difference between the sale of beer only in a restaurant and the sale of all liquors

therein is so great that our law requires a different permit from the liquor control commission for each of the two kinds of business." Id. The fact that the legislature requires a different permit to run the same physical facility depending on the type of alcohol sold, made for "a different sort of enterprise" in that case. Id. More recently in *Macaluso* v. *Zoning Board of Appeals*, 167 Conn. 596, 600, 356 A.2d 885 (1975), we held that differing statutory treatment was evidence that the sale of liquor in a package store "is an enterprise of substantially greater magnitude" than the sale of liquor in a drug store. Consequently, in that case, the substitution of a package store permit for a drug store liquor permit constituted an expansion of a nonconforming use. Id.

We follow the lead of these prior decisions in the present case. By requiring a license for over thirty-six flights the legislature has in effect created two types of heliports. The first type, in which a site may be used for no more than thirty-six flights, does not require a license from the state; while the second type, use of a site for more than thirty-six flights, requires a state license. The legislature could reasonably have concluded that occasional helicopter flights would not have a deleterious effect upon the surrounding properties considering such factors as noise, distractions and traffic, and thus would not require close supervision and licensing by the state. On the other hand, the legislature has recognized that at some point, additional flights will have a substantial impact on the surrounding community, necessitating state supervision. The legislature has chosen thirty-six flights, or an average of three per month, as the point where the character of a heliport changes and where state licensing is required. The use of the MPE site for an unlimited number of flights, therefore, would not merely increase the amount of business done under existing zoning law. The use would

be, by legislative decree, a change in the character of the heliport. See *Macaluso* v. *Zoning Board of Appeals,* supra; *Salerni* v. *Scheuy,* supra. The trial court, therefore, did not err in concluding that the proposed use of the MPE site would constitute an unlawful expansion of the plaintiffs' nonconforming use in violation of the Stamford zoning regulations.

Although we conclude that the plaintiffs may not use the MPE site for an unlimited number of flights, we have determined that at the time of the zoning change, they did possess a nonconforming use for no more than thirty-six flights per year. The trial court's judgment, however, erroneously enjoins *any* use of the property for helicopter flights even if the number does not exceed thirty-six per year.

In view of the foregoing, further proceedings are necessary at this point to evaluate the legality of the plaintiffs' nonconforming use under the ordinance passed on May 30, 1981. The plaintiffs alleged in the trial court that this ordinance is invalid in that it violates the Stamford charter, state and federal law, and "is unconstitutional." They urge us to address these issues as the entire record of the trial court proceedings is before us. We ordinarily do not rule on the facial validity of a legislative act. *State* v. *Zach,* 198 Conn. 168, 176–78, 502 A.2d 896 (1985). Moreover, because these issues were not adjudicated in the trial court, the record before us is incomplete. A determination of the validity of the ordinance, therefore, is better left to the trial court.

There is error in part, the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.