[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[MEMORANDUM OF DECISION]
On January 4, 1993 Waste Management of Connecticut, Inc. submitted an application to the New Milford Zoning Commission seeking a special permit and site plan approval in connection with the proposed use of a 10.8 acre parcel of land located on Route 7 for the storage of metal containers. (RR #1). The Waste Management site is located in an industrial zone.
The Waste Management application was filed pursuant to the provisions of Article II-VI C of the zoning regulations which permits the outside storage and/or display of inventory upon the acquisition of a special permit from the Commission.
(RR #20, p. 2-20). Appendix A.
On February 9, 1993 the Commission held a public hearing on the Waste Management application. (RR #13). The hearing on the Waste Management application was continued to and completed on March 9, 1993. (RR #16). On March 23, 1993 the Commission denied the Waste CT Page 4475 Management application. (RR #9). Notice of the decision of the Commission was published in The Danbury News Times on April 6, 1993. (RR #21). Waste Management appealed the decision of the Commission to this court on April 14, 1993.
Waste Management of Connecticut, Inc. is a subsidiary of Waste Management, Inc. which is the largest waste disposal company in the United States. In New Milford, one division of Waste Management of Connecticut, Inc. operates a landfill and recycling center, and another division operates a trash hauling division. (RR #9).
Waste Management of Connecticut, Inc. owns an approximately 10.9 acre parcel of property adjacent to Route 7 in New Milford. They acquired the property in 1986. Waste Management also owns a continguous 147 acre parcel, also adjacent to Route 7. (RR #1). The 10.9 acre parcel is a separate assessor's lot from the 147 acre parcel. On the 147 acre parcel Waste Management operates its solid waste landfill. (RR #9, RR #13, at 42, 46). Hereinafter, the 10.9 acre parcel will be referred to as the "property" and the 147 acres as the "landfill."
On January 4, 1993, Waste Management applied to the Commission for a special permit and site plan review for approval of the storage of its inventory of containers on the property. (RR #1). Adjoining property owners were duly notified. (RR #3, RR #13, at 5-6.) The New Milford Inland Wetlands Commission ruled that the proposed activities were permitted under its regulations, rendering unnecessary an application to that Commission. (RR #7).
Robert Bauer, New Milford's zoning enforcement officer, reviewed the application and submitted a report dated February 5, 1992. Aside from recommending that privacy fencing and the existing natural wooded buffer be extended, and noting that recycling (which Waste Management's container storage does not involve) is permitted only in the Government Service Zone, Mr. Bauer concluded that "[a]ll other aspects of the application appear[ed] to be in order." (RR #4). CT Page 4476
The Commission held a public hearing on February 9, 1993, at which Waste Management presented its application. (RR #9 (minutes); RR #13 (transcript)). Mr. William Howard, site engineer at the Waste Management New Milford facility, outlined the application and the proposed use for the Commission, detailing the steps proposed to be undertaken in response to the concerns outlined in Mr. Bauer's February 5 report, and describing the uses of the surrounding property. (RR 13, at 4-14.)
Mr. Howard stated that the proposed use of the property involves the storage of clean, empty containers which are used by Waste Management's hauling division in the course of its operation. That operation, which is seasonal, involves the distribution of empty waste containers to customers in the Town of New Milford and elsewhere whose waste collection and disposal needs exceed what can be handled ordinary, household size containers. Either pursuant to a schedule or on an as-needed basis, the containers, when filled with trash, are hauled to the landfill and emptied, then returned to the customer's site. When the customer no longer needs the container at the site, the customer notifies waste Management, which picks up the container, empties it at the landfill, sweeps and shovels it out, reconditions it, then stores it on the property until needed by another customer. (RR #13, at 5-19). Under both Waste Management's policies and State DEP regulations, no waste whatsoever is permitted in the containers when they are stored.
Mr. Howard clarified that the special permit was being sought in connection with the hauling division's need to store its containers between jobs, and that the parcel, as well as the proposed use, were separate from the landfill both functionally and practically. (RR #9, at 7; RR #13, at 42-46.)
Mr. Howard stated that tests had been conducted by an outside consultant to determine the amount of noise expected to be generated by actual moving of the containers, a relatively infrequent occurrence. The tests, which measured the decibel levels at the boundary line, demonstrated compliance with DEP limits under all anticipated conditions. (RR #13, at 45-46.) CT Page 4477
At the February 9, 1993 hearing, the Commission voted to require that a traffic study be completed, and to keep the public hearing open until the study had been submitted. (RR #13, at 67-68.) Waste Management accordingly engaged Wilbur Smith Associates, a planning consultant, which completed a study, dated March 3, 1993. (RR #15). The study was discussed at the continued public hearing on March 9, 1993. (RR #16). In response to a question from Chairman Doring, Leonard Reistetter of Wilbur Smith Associates stated that a negligible amount of traffic would be added to Route 7 as a result of the proposed activity and described the supporting data and analysis in great detail. This evidence was uncontroverted. (RR #16, at 2) The public hearing was closed without further comment from the public. (RR #16, at 16).
On March 23, 1993, the Commission met to discuss and decide on Waste Management's application. After a discussion that included an extensive review of Attorney Byrne's opinion letter (Appendix B), in which he advised the Commission that the proposed use did not constitute an expansion of the landfill, the Commission voted 3-2 to deny the application, each member stating his own reason for denial. (RR #17, at 17-19) By letter dated March 25, 1993, Waste Management was notified of the Commission's decision. This letter stated, as reasons for denial, those voiced by the individual Commission members at the March 23, meeting. (RR #22) Those reasons were:
 1. The storage of the equipment would be an extension of the landfill.
 2. The uncleanliness of the containers as shown in the pictures submitted at the public hearing of February 9, 1993.
 3. The possibility of the site becoming a transfer station.
(RR #22)
[I] CT Page 4478
Waste Management is the owner of the land on which it seeks a special permit to store containers. As owner of the property affected by the decision, Waste Management is aggrieved as a matter of law. See Conn. Gen.Stat. § 8-8(a)(1); [Nick v. Planning and ZoningCommission], 6 Conn. App. 110 (1986).
[II]
A zoning authority considering an application for a special permit acts in an administrative capacity. [A.P. W. Holding Corporation v. Planning Zoning Board],167 Conn. 181, 185 (1974). It has no discretion to deny an application if the requirements of regulations and statutes are met. [Westport v. Norwalk], 167 Conn. 151,155 (1974); [Daughters of St. Paul v. Zoning Board ofAppeals], 17 Conn. App. 53, 56 (1988).
In reviewing the zoning authority's action, the court must determine whether the reasons for denial are supported by the record, and whether they are pertinent to the decision. [Daughters of St. Paul v. Zoning Boardof Appeals], supra at 56. However, "a court cannot take the view in every case that the discretion exercised by the local zoning authority must not be disturbed, for if it did the right of appeal would be empty. . . ." [Daughters of St. Paul v. Zoning Board of Appeals], supra, at 57. Thus, the court should scrutinize the reason for denial and, if not legally valid, or if unsupported by the record, approve the application. See [Thorne v.Zoning Commission], 178 Conn. 198 (1979).
[III]
There is no dispute that the landfill is a legally existing nonconforming use. (RR #17 at 3; RR #26) Likewise, there can be no dispute that the outside storage of inventory is a use which is permitted in the district, (RR #2; RR #19; RR #27) and there can be no doubt of its truth since the regulations were amended in the fall of 1992. Finally, there is no dispute that the proposed use will occur on a parcel which is separate from the parcel on which Waste Management operates the landfill. Therefore, the proposed storage of containers is not, and cannot be treated as an extension or CT Page 4479 expansion of the legally existing nonconforming landfill use.
Under Article XI-II of the New Milford Zoning Regulations, a nonconforming use "shall not be enlarged or increased or be extended to occupy a greater area of land than that occupied by such use" at the time of the adoption or amendment of the zoning ordinance. (RR #20 11-12.) According to Connecticut courts, there is an illegal "extension or expansion" only when there is a change in the character of the use. "[A] mere increase in the amount of business done in pursuance of a nonconforming use, or a change in the equipment used, does not constitute a change in the use itself." [Salerniv. Scheuy], 140 Conn. 566, 571 (1954); [HelicopterAssociates v. City of Stamford], 201 Conn. 700, 716
(1986); (RR #26, at 2).
[Salerni] and [Helicopter Associates] illustrate what is meant by a change in "character" of a use. In [Salerni], the applicant sought to sell all alcoholic beverages, rather than only beer and wine, at its nonconforming restaurant. The court found that the change, which would require a different type of permit, constituted an illegal change in the character of the use. In [Helicopter Associates], the applicant sought to operate a commercial heliport at the site. The applicant had constructed its heliport, and used it for five flights within a one year period. It had not obtained a permit, which was required in order to make more than thirty-six flights per year. The court found that the applicant had established a use of the heliport for up to thirty-six flights per year, but that a use for any more flights would constitute a change in character of the use.
Waste Management's proposed storage of containers on the property fits within neither the language of Article XI-II nor the caselaw discussed above. The validly existing landfill use will not be increased in volume or scope by the proposed storage of containers; nor will the character of that use be altered. In fact, the storage of containers will have no impact whatever on the landfill use, or on the landfill parcel. The storage of containers will be an entirely separate use. CT Page 4480
[IV]
In determining whether or not to issue a permit, the Commission may not assume that a permit holder will act in violation thereof. [State ex rel. The Newfield SwimClub v. Swinnerton], 22 Conn. Sup. 336, 339 (1967). In [Newfield], the plaintiff sought a writ of mandamus requiring the defendant to issue a permit for the plaintiff's construction of a pool and other recreational facilities. One reason for denial was that the building inspector "was not convinced" that the club was a nonprofit organization, as required by the regulations. The inspector admitted that the applicant was entitled to the permit if it was a nonprofit corporation. An application had been made to form such a corporation, but the process had not been completed. The immediate sponsor, therefore, was a profit-making organization. The court held that the permit could not be denied on the ground that "the applicant or someone else will put the facilities to an improper use." Id. "[S]ince the application was in behalf of a nonprofit club . . ., it must be assumed that it will be operated to comply with the zoning regulations." Id.
The Commission in this case listed as its second reason for denial of container storage "the uncleanliness of the containers as shown in the pictures submitted at the public hearing of February 9 1993." (RR #22) The record does not indicate that the containers had waste in them at the time Waste Management placed them into storage. Id. In fact, Mr. Howard testified without challenge that the containers, like all containers, were empty and clean when they went into storage, and that any debris contained therein had been placed there by trespassers. (RR #13 at 48-50) Mr. Howard also suggested measures that could be taken to cure the problem, some of which had been suggested by the zoning enforcement officer, Robert Bauer. Id.
The application at issue here is to store containers, (RR #1) which the applicant will store in a clean and empty condition. (RR #13, at 13-19) The permit itself could include a condition that the containers must be stored clean and empty. (RR #17, at CT Page 4481 13-14). The Commission may not assume that Waste Management will act otherwise, and may not deny the permit on that basis.
[V]
The denial letter listed as a reason for denial "The possibility of the site becoming a transfer station." (RR #22) Other than the unsupported speculation of one member of the Commission, there is no support in the record for the inference that the property may be used as a transfer station. (RR #17, at 12 (comments of J. Lambert)) In fact, the property cannot become a transfer station under the special permit sought in this case. (RR #17, at 13-14 (comments of G. Doring, noting permit condition that containers be stored clean and empty)).
For the reasons noted in the previous section, the Commission may not assume that Waste Management of Connecticut will act in violation of an issued permit. Furthermore, with no evidence of any kind to support the speculation that the property will be used as a transfer station, the denial based on that concern is entirely without foundation, and therefore arbitrary, capricious, and beyond the scope of the Commission's authority.
The court finds that the denial of the plaintiff's application for a special permit to store containers was arbitrary and in abuse of discretion and that therefore the appeal must be sustained.
PICKETT, J.
APPENDIX A —
Amend Article II-II — Use Permitted in the B-1 Restricted Business Zone by adding a new paragraph D. to provide as follows:
II-III Uses permitted in the B-2 General Business Zone.
 D. The outside storage and/or display of inventory may be permitted as a special permit use, following a public hearing, subject to compliance with the standards stated in Article III A. and the approval of site and landscaping plans as stated in Article III. No outside storage area CT Page 4482 shall extend into any required front yard, side yard, rear yard or required buffer area specified in any section of these regulations. The total ground coverage by all buildings, structures and outside storage areas, but excluding areas for off-street parking, loading, driveways, sidewalks, terraces and all paved areas on any lot, shall not exceed the percentage of lot area coverage specified in Article X-II of these regulations for business zones.
II-III Uses Permitted in the B-2 General Business Zone.
 18. The outside storage and/or display of inventory. No outside storage area shall extend into any required front yard, side yard, rear yard or required buffer area specified in any section of these regulations. The total ground coverage of all buildings, structures and outside storage areas, but excluding areas for off-street parking, loading, driveways, sidewalks, terraces and all paved areas on any lot, shall not exceed the percentage of lot area coverage specified in Article X-II for business zones.
Amend Article II-IV — Uses Permitted in the B-3 Lake Business Zone by adding a new paragraph to provide as follows:
 The outside storage and/or display of inventory may be permitted as a special permit use, following a public hearing, subject to compliance with the standards stated in Article III A. and the approval of site and landscaping plans as stated in Article III. No outside storage area shall extend into any required front yard, side yard, rear yard or required buffer area in any section of these regulations. The total ground coverage by all buildings, structures and outside storage areas, but excluding areas for off-set street parking, loading, driveways, sidewalks, terraces and all paved areas on any lot, shall not exceed the percentage of lot area coverage specified in Article X-II of these regulations for business zones.
II-VI Uses Permitted in the Industrial Zone.
 C. The outside storage and/or display of inventory may be permitted as a special permit use, following a public hearing, subject to compliance with the standards stated in Article III A. and the approval of site and landscaping plans as stated in Article III. No outside storage area CT Page 4483 shall extend into any required front yard, side yard, rear yard or required buffer area specified in any section of these regulations. The total ground coverage by all buildings, structures and outside storage areas, but excluding areas for off-street parking, loading, driveways, sidewalks, terraces and all paved areas on any lot, shall not exceed the percentage of lot area coverage specified in Article X-II of these regulations for industrial zones.
APPENDIX B
 LAW OFFICES THOMAS P. BYRNE 2-E FARMINGTON COMMONS 790 FARMINGTON AVENUE FARMINGTON, CONNECTICUT 06032 TELEPHONE (203) 677-7355
4 MAY 1992
George Doring, Chairman New Milford Zoning Commission 10 Main Street New Milford, CT 06776
Dear George,
Waste Management of Connecticut, Inc. (hereinafter referred to as "Waste Management") has filed an application for site plan approval with the Commission seeking permission to use a 10 acre parcel of land which it owns on the westerly side of Danbury Road as the site from which to "store empty refuse containers of various sizes in a clean condition."
The 10 acre site is located in an Industrial zone and is adjacent to a much larger parcel of land owned by Waste Management in the Industrial zone on which it conducts a landfill operation as a legally existing nonconforming use.
The Commission has inquired whether the use of the 10 acre parcel as proposed by Waste Management would constitute the illegal expansion of the existing nonconforming landfill operation.
It is a general principle in zoning that nonconforming uses CT Page 4484 should be abolished or reduced to conformity as quickly as the fair interests of the parties will permit. In no case should they be allowed to increase. [Salerni vs. Scheuy],140 Conn. 566, 570 (1954). On the other hand, § 8-2 of the General Statutes provides that zoning regulations "shall not prohibit the continuation of any nonconforming use, building or structure existing at the time of the adoption of such regulations." In the New Milford zoning regulations, Article XI-II subparagraph (a) provides as follows:
"No such nonconforming use shall be enlarged or increased or be extended to occupy a greater area of land than that occupied by such use at the time of the adoption of this zoning ordinance or any amendment thereto or be extended to a greater height than that which existed at the time of the adoption of this zoning ordinance or any amendment thereto."
At a meeting of the Commission held on April 14, 1992 Mr. John Monoco, Acting General Manager of the landfill, stated the following at page 11 thereof:
"Mr. Monoco: That's right, they are owned by the New Milford Hauling Company. What happens, Don, is that when an account closes out, and they have been utilizing our services, our collection services, we go out and collect the box. We clean the box and then the box goes into storage, into inventory. It becomes a surplus until a new account comes along and the need for that particular type of container arises and then the container is collected, picked up and transported to the location to the new customer."
The courts of this state have held on previous occasions that a mere increase in the amount of business done pursuant to a nonconforming use is not an illegal expansion of the original use. [Helicopter Associates, Inc. vs. Stamford], 201 Conn. 700,716; [Guilford vs. Landon], 146 Conn. 178, 183. In order for there to be a change in character of that use in order to bring it within the prohibition of the zoning ordinance. [Salerni vs.Scheuy], 140 Conn. 566, 571.
It is my understanding that the Commission has determined that the use of the 10 acre site as a place to store empty refuse containers, as proposed by Waste Management, is a permitted use of land in the Industrial zone. In my opinion, it necessarily follows from this determination that the commencement of CT Page 4485 a permitted use cannot constitute the prohibited extension or expansion of a legally existing nonconforming use. The nonconforming characteristic of the property cannot be changed by the institution of a permitted use.
Very truly yours,
Thomas P. Byrne
TPB:pwb
[EDITORS' NOTE: THE CASE THAT PREVIOUSLY APPEARED ON THIS PAGE HAS BEEN MOVED TO CONN. SUP. PUBLISHED OPINIONS.]
CT Page 4493