******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

PUTNAM PARK APARTMENTS, INC., ET AL. *v.*
PLANNING AND ZONING COMMISSION
OF THE TOWN OF GREENWICH
ET AL.
(AC 41696)

Alvord, Bright and Bear, Js.

*Syllabus*

The plaintiffs appealed to the trial court from the decision of the defendant
Planning and Zoning Commission of the Town of Greenwich approving
the applications of the defendant N Co. for a special permit and a site
plan to construct a new building on property owned by C and leased
to N Co., which abuts the plaintiffs' properties. The trial court rendered
judgment dismissing the appeal, from which the plaintiffs, on granting
of certification, appealed to this court. They claimed, inter alia, that the
trial court improperly agreed with the commission's interpretation of a
certain building zone regulation (§ 6-94 [b] [1]) to allow the commission
to permit a building closer than 100 feet from the plaintiffs' property
lines if, after considering the proposed use and its specific location,
the commission found that the closer distance would not produce any
adverse impacts on the abutting properties. Specifically, the plaintiffs
claimed that § 6-94 (b) (1) allows the commission to locate a building
closer than 100 feet from their property lines only if that closer location
affirmatively will protect the plaintiffs from whatever adverse impacts
they would endure if the building were located 100 feet or more from
their property lines. *Held*:
1. The trial court properly determined that the commission's construction
   of § 6-94 (b) (1) of the regulations was proper; the plain language of
   the regulation requires the commission to consider the particular use
   and specific location of charitable institutions applying for a permit to
   construct a building less than 100 feet from a neighboring property line,
   the requirement in the regulation that the permit may not be issued
   unless the lesser distance would protect the property owners from
   adverse impacts requires the commission to find by substantial evidence
   that there will be no adverse impacts on adjacent properties due to
   the building being closer than 100 feet, and the plaintiffs' construction
   implied a decision-making process not set forth in the regulation.
2. There was substantial evidence in the record from which the commission
   could have concluded that the proposed facility was in compliance with
   certain building zone regulations (§§ 6-15 and 6-17), which required the
   commission to take into account whether N Co.'s proposed facility
   was in conformity with the plan of conservation and development; the
   evidence demonstrated that N Co. has operated on C's property for
   approximately forty years, that it has been part of the residential neigh-
   borhood during that time, that it currently operates out of facilities that
   are not adequate to meet the needs of the community, and that it serves
   an important function in the community, the proposed building, which
   will be located on C's property adjacent to where N Co. currently oper-
   ates, is closer to the plaintiffs' properties to protect natural resources,
   including mature trees, and under N Co.'s proposal, exiting drainage
   would be improved, new trees and vegetation will be planted, and the
   proposed facility would complement existing buildings on the site and
   have no adverse impact on the historical nature of the area.
3. The trial court and commission properly concluded the provision (§ 6-
   95) of the building zone regulations governing accessory uses does not
   apply to N Co.'s special permit application; the proposed building meets
   a permitted use definition for special exceptions under a separate regula-
   tion (§ 6-94), which addresses nonresidential uses, and it was illogical
   to apply § 6-95 to § 6-94 uses such as N Co.'s proposed building.

Argued May 20—officially released September 24, 2019

*Procedural History*

Appeal from the decision by the named defendant approving the applications by the defendant Neighbor to Neighbor, Inc., to construct a new building on property owned by defendant the Parish of Christ Church, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hon. Taggart D. Adams*, judge trial referee; judgment dismissing the appeal, from which the plaintiffs, on the granting of certification, appealed to this court. *Affirmed.*

*Stephen G. Walko*, with whom, on the brief, was *Andrea C. Sisca*, for the appellants (plaintiffs).

*Evan J. Seeman*, with whom were *John K. Wetmore* and *Edward V. O'Hanlan*, for the appellees (named defendant et al.).

*Opinion*

BRIGHT, J. The plaintiffs, Putnam Park Apartments, Inc. (Putnam Park), and Putnam Hill Apartments, Inc. (Putnam Hill), appeal from the judgment of the Superior Court affirming the decision of the defendant Planning and Zoning Commission of the Town of Greenwich (commission), which had approved the special permit and site plan applications of the defendant Neighbor to Neighbor, Inc. (Neighbor), to construct a new building on property, owned by the defendant Parish of Christ Church (Church) and leased to Neighbor, abutting the plaintiffs' properties.[1] On appeal, the plaintiffs claim that the court improperly (1) agreed with the commission's interpretation of § 6-94 (b) (1) of the Greenwich building zone regulations (regulations), (2) concluded that the commission properly found that the record contained substantial evidence that Neighbor's proposal was consistent with §§ 6-15 and 6-17 of the regulations, and (3) concluded that § 6-95 of the regulations did not apply to Neighbor's special permit application. We affirm the judgment of the Superior Court.

The following facts, as revealed by the record, and procedural history inform our review. Neighbor is a charitable corporation that has provided clothing and food to people in need within the Greenwich community for approximately forty years. Neighbor operates out of a 2300 square foot space in the basement of two buildings on Church's property, located at 248 East Putnam Avenue. That space, however, is not handicapped accessible, and it does not meet the needs of Neighbor and the people it serves. Because of the limitations of the space at 248 East Putnam Avenue, Neighbor has resorted to the use of approximately 600 square feet of onsite storage containers. To address these issues, Church and Neighbor reached an agreement whereby Neighbor will lease a portion of Church's property located at 220 East Putnam Avenue in order to construct a parking and loading area, and a new 6363 square foot building, which will provide Neighbor with administrative offices, a community room, and the necessary space for clothing and food intake and distribution (proposed facility).

The property at 220 East Putnam Avenue is a trapezoidal shaped parcel consisting of 5.25 acres situated south of East Putnam Avenue approximately where Park Avenue and Park Place intersect with East Putnam Avenue from the north. The property is in an R-20 zone. This property also is the site of the Tomes-Higgins House, a nineteenth century residence designed by Calvert Vaux, and an associated carriage house, located in a setting with mature trees in downtown Greenwich. Putnam Hill's property is located and abuts on the southern end of 220 East Putnam Avenue's eastern boundary, and Putnam Park's property is located and abuts 220 East Putnam Avenue's southern boundary. Putnam Hill and

Putnam Park are apartment complexes containing a total of 397 individually owned apartments between them. To the east of 220 East Putnam Avenue is 248 East Putnam Avenue, which is the location of Church's parish house, annex, and sanctuary, and is the location out of which Neighbor currently operates.

On October 14, 2015, Neighbor filed a special permit application and a preliminary site plan application with the commission to permit the construction of the proposed facility. During discussions, Neighbor and Church informed the commission that there would be no significant changes in Neighbor's present programs. After the submission of its preliminary application, the commission held public hearings on December 8, 2015, and February 2 and 23, 2016. The commission, thereafter, recognized that Neighbor's current needs were not being met, and it voted to have Neighbor submit a final site plan and special permit applications for its proposed facility. The commission noted that the proposed Neighbor building would be situated 100 feet from the rear (southern) property line and approximately thirty-eight feet from the eastern property line,[2] and it set forth specific items that Neighbor needed to address in its final application. Among those items were the relocation of the rear parking area for the new building, the hours of operation, the protection of all existing mature trees on the property, additional buffering from adjacent properties, and the outstanding comments from other town departments and commissions, as well as from the commission's traffic consultant, the BETA Group.

On May 27, 2016, Neighbor submitted its final site plan and special permit applications. Following public hearings held on September 8, 2016, and October 4, 2016, the commission voted, on October 18, 2016, to grant Neighbor's final site plan and special permit applications, with several conditions imposed. In a November 1, 2016 letter, the full decision of the commission, detailing its findings and conditions of approval, was sent to Neighbor's attorney.[3] The special permit certificate and the site plan approval certificate also were issued on that day. By complaint dated November 8, 2016, the plaintiffs appealed to the Superior Court from the commission's decision to approve the site plan and issue a special permit to Neighbor. On March 6, 2018, the Superior Court, *Hon. Taggart D. Adams*, judge trial referee, after determining that the plaintiffs properly had established aggrievement, which is not challenged on appeal to this court, concluded, in a thoughtful and thorough memorandum of decision, that the commission properly had interpreted its regulations and that there was substantial evidence in the record to support the commission's decision, and it dismissed the plaintiffs' appeal. Following our granting of the plaintiffs' petition for certification to appeal; see General Statutes § 8-8 (o); this appeal followed. Additional facts will be

set forth as necessary.

## I

The plaintiffs first claim that the court erred in agreeing with the commission's interpretation of § 6-94 (b) (1) of the regulations. The plaintiffs argue: "In finding that the [c]ommission correctly interpreted and properly applied [§] 6-94 (b) (1) [of the regulations], the . . . [c]ourt necessarily interpreted [§] 6-94 (b) (1). Such interpretation was contrary to the plain language of the regulation and should be reversed." We disagree.

"Because the interpretation of the regulations presents a question of law, our review is plenary. . . . Additionally, zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Ordinarily, [appellate courts afford] deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when [an] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." (Citation omitted; internal quotation marks omitted.) *Field Point Park Assn., Inc.* v. *Planning & Zoning Commission*, 103 Conn. App. 437, 439–40, 930 A.2d 45 (2007).

Section 6-94 (b) (1) of the regulations provides in relevant part: "The following uses shall be permitted in . . . R-20 . . . zones . . . when authorized by the . . . [c]ommission by [s]pecial [p]ermit issued pursuant to [§] 6-17 [of the regulations] . . . philanthropic or charitable institutions not of a penal or correctional nature . . . provided that any building so permitted shall be located not less than one hundred (100) feet from any street or lot line *unless the [c]ommission finds in consideration of the particular use and its specific location that a lesser distance will protect adjacent property owners from adverse impacts.*" (Emphasis added.)

The plaintiffs argue: "There is no dispute between the parties that . . . Neighbor is a qualified charitable institution as contemplated by [§] 6-94 (b) (1). The second part of [§] 6-94 (b) (1) [however] states that a special permit may be issued, 'provided that any building so permitted shall be located not less than one hundred (100) feet from any street or lot line unless the [c]ommission finds in consideration of the particular use and its specific location that a lesser distance will protect

adjacent property owners from adverse impacts.' It is this limitation on the [c]ommission's authority that the [c]ommission, and subsequently the . . . [c]ourt, misinterpreted." Specifically, the plaintiffs contend that the language of § 6-94 (b) (1) "clearly required [d]efendant Neighbor to identify any adverse impacts to [the] [p]laintiffs' properties arising from locating the building 100 feet or more from the abutting property lines, then show that moving the building within the 100 foot setback will protect [the] [p]laintiffs from those adverse impacts."

The plaintiffs construe § 6-94 (b) (1) to allow the commission to locate a building closer than 100 feet from their property lines *only if* that closer location "affirmatively will protect" the plaintiffs from whatever adverse impacts they would endure if the building were located 100 feet or more from their property lines. In other words, unless moving the proposed building location closer than 100 feet "affirmatively will protect" against adverse impacts on the plaintiffs created by the farther location, the commission does not have the authority to permit it; this would be true even if it would be impossible for the applicant to build at a distance of more than 100 feet and the closer location would have no adverse impacts on the plaintiffs whatsoever.

The Superior Court and the commission, on the other hand, construed § 6-94 (b) (1) to allow the commission to permit a building closer than 100 feet from the plaintiffs' property lines if, after considering the proposed use and its specific location, the commission finds that the closer distance would not produce any adverse impacts on the abutting properties. In other words, they concluded that the commission has the authority, after considering the specific proposed use and location of the area for which the special permit is sought, to permit a building closer than 100 feet from the property line if there would be no adverse impacts on the plaintiffs created by the closer location.[4] We agree with the court that the commission's interpretation was correct.

Section 6-94 (b) (1) of the regulations specifically requires the commission to consider "the particular use and its specific location" when it considers whether to permit a philanthropic or charitable institution to construct a building less than 100 feet from a neighboring property line, which, by its language, gives the commission some amount of discretion to grant the special permit after considering the use and location of the proposed building. The regulation also provides, however, that the commission may not permit such a building unless that "lesser distance will protect adjacent property owners from adverse impacts." We construe that restriction to mean that the commission must find, by substantial evidence, that there will be no adverse impacts on the adjacent property due to the building being closer than 100 feet.[5] This conclusion

is based on the plain and straightforward wording of the regulation.

By contrast, the plaintiffs have offered a convoluted interpretation that implies a decision-making process not set forth in the regulation. According to the plaintiffs, the commission first would have to determine whether there were any adverse impacts on abutting property owners from permitting the building anywhere that was more than 100 feet from the lot line. Only if there is a determination that such adverse impacts exist could the commission then consider whether permitting the building within 100 feet of the lot line would protect the abutting owners from the adverse impacts they would have experienced had the building been located more than 100 feet from the lot line. Although the town may have been able to adopt a regulation that provided for such a process, it did not do so with its adoption of § 6-94 (b) (1). We will not read into a regulation words or limitations that are not there. See *Red Hill Coalition, Inc.* v. *Conservation Commission*, 212 Conn. 710, 726, 563 A.2d 1339 (1989) (absent direction from legislative body, court will not read into legislation requirement that is not expressed therein); *Point O' Woods Assn., Inc.* v. *Zoning Board of Appeals*, 178 Conn. 364, 366, 423 A.2d 90 (1979) ("courts cannot, by construction, read into statutes provisions which are not clearly stated"). Furthermore, we will adopt an interpretation of a regulation or statute consistent with its plain language over one that requires mental gymnastics to reach a desired result. See *Kobyluck Bros., LLC* v. *Planning & Zoning Commission*, 167 Conn. App. 383, 392, 142 A.3d 1236 ("[b]ecause zoning regulations are in derogation of common law property rights . . . the regulation[s] cannot be construed beyond the fair import of [their] language to include or exclude by implication that which is not clearly within [their] express terms . . . [and] doubtful language will be construed against rather than in favor of a [restriction]" [citations omitted; internal quotation marks omitted]), cert. denied, 323 Conn. 935, 151 A.3d 838 (2016). Accordingly, we conclude that the court properly determined that the commission's construction of § 6-94 (b) (1) was proper.

II

The plaintiffs also claim that the court improperly concluded that the commission properly found that the record contained substantial evidence that Neighbor's proposal is consistent with §§ 6-15[6] and 6-17 (d)[7] of the regulations. We are not persuaded.

"General Statutes § 8-2 (a) provides in relevant part that local zoning regulations may provide that certain . . . uses of land are permitted only after obtaining a special permit or special exception . . . subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, conve-

nience and property values. . . . A special permit allows a property owner to use his property in a manner expressly permitted by the local zoning regulations. . . . The proposed use, however, must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values. . . . An application for a special permit seeks permission to vary the use of a particular piece of property from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district. . . . When ruling upon an application for a special permit, a planning and zoning board acts in an administrative capacity. . . . [Its] function . . . [is] to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. . . . Review of a special permit application is inherently fact-specific, requiring an examination of the particular circumstances of the precise site for which the special permit is sought and the characteristics of the specific neighborhood in which the proposed facility would be built." (Citations omitted; internal quotation marks omitted.) *Meriden* v. *Planning & Zoning Commission*, 146 Conn. App. 240, 244–45, 77 A.3d 859 (2013).

"In reviewing a decision of a zoning board, a reviewing court is bound by the substantial evidence rule . . . . If [the reviewing] court finds that there is substantial evidence to support a zoning board's findings, it cannot substitute its judgment for that of the board. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . .

"This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . The corollary to this rule is that absent substantial evidence in the record, a court

may not affirm the decision of the board." (Citation omitted; internal quotation marks omitted.) Id., 246–47.

Section 6-15 of the regulations sets forth the commission's standards for site plan review. See footnote 6 of this opinion. Section 6-17 (d) sets forth the standards to be considered when the commission acts on a special permit application. See footnote 7 of this opinion. The plaintiffs argue that Neighbor provided no evidence to the commission that the proposed facility met the standards contained in § 6-17 (d) or in § 6-15 (a) (1), (3), or (4) of the regulations. We consider each of these standards.

Sections 6-15 (a) (1) and 6-17 (d) (1) require that the commission take into account whether Neighbor's proposed facility is in conformity with the plan of conservation and development (plan). The plan states that it is "an advisory document . . . [that] contains the recommendations for [t]own agencies, boards and departments." "Implementation of the [p]lan is an ongoing process," with some recommendations taking until "the end of the planning period or beyond." The specific portions of the plan that the plaintiffs raise in their brief are set forth in the goals synopsis section of the plan. Specifically, the plaintiffs cite to three of the goals, as to which, they claim, there is no evidence of compliance. The first goal cited by the plaintiffs is that the town "[b]e and remain primarily a well-maintained residential community for all of our current and future residents." The second goal cited is that the town "[p]rotect and enhance well-defined neighborhoods and village centers," and the third goal cited is that the town "[p]rotect and enhance water and land natural resources, pervious surfaces, open space, parklands, recreational facilities and areas in an environmentally sensitive manner." The defendants, on the other hand, argue that there was substantial evidence that the proposed facility is in accord with the plan, but, even if there was not substantial evidence that the proposal meets each goal of the plan, the plan is only an advisory document. We conclude that there was substantial evidence that the proposed facility is in keeping with the plan.

The evidence demonstrates that Neighbor has operated on Church's property for approximately forty years, and that it has been part of this residential neighborhood during that time. It also currently operates out of facilities that are not adequate to meet the needs of the Greenwich community that Neighbor serves, including that the current facility is too small and not handicapped accessible. The proposed facility will be located on Church property, adjacent to where Neighbor currently operates. Although not cited by the plaintiffs, the plan also includes a goal to "provide and support facilities and services to meet community needs." The plan document explains: "Greenwich has many varied private organizations that provide services and commu-

nity facilities for the [t]own. These organizations contribute to the overall quality of life in Greenwich and their efforts should be supported."

Another goal of the plan is to "preserve the natural landscape to protect resources . . . ." The proposed facility is closer to the plaintiffs' properties to protect the natural resources, including the mature trees, and the historical site located on 220 East Putnam Avenue. The plan sets forth various methods to help accomplish the goal of preserving the natural landscape, one of which is to address flooding and storm water management. The evidence before the commission was that the existing storm water basin in this area is prone to flooding, which will be remedied as part of Neighbor's proposal. Furthermore, additional trees and vegetation will be planted, including along the property lines that abut the plaintiffs' properties. On the basis of the evidence before the commission, we conclude that there was substantial evidence that the proposed facility was in keeping with the plan.

Section 6-15 (3) of the regulations requires that the commission take into account whether the proposed facility protects the "environmental quality and the preservation and enhancement of the property values," and it sets forth seven different aspects of the site plan that the commission must evaluate to determine the conformity of a site plan to this standard. Specifically, this subsection requires that the commission evaluate the following: "(a) Adequacy of open spaces, screening and buffering between similar and dissimilar uses to assure light, air, privacy and freedom from nuisance or other disturbance . . . (b) [t]he location, height and materials of walls, fences, hedges and plantings so as to ensure harmony with adjacent development, screen parking and loading areas, and conceal storage areas, utility installations and other such features, all in conformity with the requirements of [§] 6-176 of the building zone regulations; (c) [t]he prevention of dust and erosion through the planting of ground cover or installation of other surfaces; (d) [t]he preservation of natural attributes and major features of the site such as wetlands, highly erodible areas, historic structures, major trees and scenic views both from the site and onto or over the site; (e) [t]he conformity of exterior lighting to the requirements of [§§] 6-151 to 6-153 of the [b]uilding [z]one [r]egulations; (f) [t]he design and arrangement of buildings and accessory facilities and the installation of proper shielding so as to minimize noise levels at the property boundary; and (g) [t]he provision of adequate storm and surface water drainage facilities to properly drain the site while minimizing downstream flooding, yet not adversely affect water quality as defined by the State Department of Environmental Protection." The plaintiffs contend that there was no evidence of compliance with this standard. Our review of the record reveals otherwise.

Neighbor's proposal addressed each of the aspects set forth in § 6-15 (a) (3), including: significant screening, buffering, planting of trees, and hiring a licensed arborist to oversee the area during construction; preserving mature trees on site; preserving the historic nature of the area surrounding the Tomes-Higgins House on site; redesigning the proposed building to address the concerns of the historic district commission; addressing the lighting of the site, including ensuring that outside lighting is on a timing mechanism; requiring strict adherence to the town's noise ordinance; restricting delivery times and times of operation; and implementing a storm water management plan that improves existing drainage.

The plaintiffs also contend that there is no evidence that the proposed facility will comply with § 6-15 (a) (4), which requires the commission to consider the building design, the neighborhood appearance, and the overall site design, to ensure that the proposal is in harmony with existing buildings and the natural terrain and vegetation in the neighborhood. They also contend that there is no evidence that the proposal will comply with § 6-17 (d) (11), which, similar to § 6-15 (a) (4), requires the commission to consider whether the proposal will materially adversely affect residential uses in the neighborhood or be detrimental to the neighborhood or its essential characteristics.

There was evidence submitted to the commission from Neighbor's architect, who opined that the proposed facility would complement existing buildings on the site. There also was evidence that the town's historic district commission initially did not like the original building design that was proposed, so Neighbor changed the design, which then was approved by the state's Historic Preservation Office. There was evidence that in the immediate vicinity of 220 East Putnam Avenue are several religious, civic, and nonprofit institutions, including Temple Sholom, the local YWCA, the Junior League, and Putnam Cottage, along with a private office building called The Columns. Additionally, there was evidence that the mature trees will remain on site and new trees and vegetation will be planted.

There also was evidence that there would be no adverse impact to the historic nature of the area surrounding the Tomes-Higgins House, and that existing drainage will be improved in the area. Further evidence showed that Neighbor has been operating in this area for approximately forty years, that it is a part of this neighborhood, and that it serves an important function, which the plaintiffs do not dispute. Accordingly, we conclude that there was substantial evidence from which the commission could conclude that the proposed facility was in compliance with these specific portions of §§ 6-15 and 6-17 (d) of the regulations.

III

The plaintiffs' final claim is that the court and the commission improperly concluded that § 6-95 of the regulations does not apply to Neighbor's special permit application. They argue that Neighbor applied to construct a second building at 220 East Putnam Avenue, which is in an R-20 zone, and, therefore, § 6-95 applies because the proposed building necessarily would be an accessory structure to the Tomes-Higgins House, which already is located on the property. According to the plaintiffs: "The record does not contain any evidence that allowing . . . Neighbor's proposal, in addition to the already existing Tomes-Higgins House and carriage house on the property, is permissible under the regulations in an R-20 zone, which allows only uses that are customary and secondary to a single family dwelling." The defendants argue that the proposed building is not an accessory structure, but, rather, a second principal structure, and, therefore, § 6-95 does not apply. Additionally, the defendants argue that pursuant to the plain language of § 6-95, that regulation applies only to the principal uses set forth in § 6-93, which do not include the uses at 220 East Putnam Avenue. We agree that § 6-95 does not apply to Neighbor's proposed building.

As set forth in part I of this opinion, the interpretation of a zoning regulation is a question of law, to which we apply plenary review. *Field Point Park Assn.*, *Inc.* v. *Planning & Zoning Commission*, supra, 103 Conn. App. 439.

Section 6-95 of the regulations provides in relevant part: "(a) Customary uses *incident to the principal uses in [§] 6-93* shall be permitted in RA-4, RA-2, RA-1, R-20 and R-12 zones and R-7 zone (by the cross reference in [§] 6-97 (b) (1) to RA-4 zones permitted uses) and R-6 zone (by the cross reference in [§] 6-98 (b) (1) to R7 zones permitted uses)." (Emphasis added.)

Section 6-93 of the regulations provides: "(a) The following principal uses are permitted in RA-4, RA-2, RA-1, R-20 and R-12 Zones and all other principal uses are expressly excluded: (1) Detached single family dwellings, one (1) per lot. (2) Streets, parks, playgrounds, public school grounds and Town buildings and uses."

Section 6-95 (a) specifically states that it applies to the principal uses set forth in § 6-93. Section 6-93 lists several principal uses, none of which include the uses currently at or proposed at 220 East Putnam Avenue. Neighbor's proposed building is only permitted because it meets one of the permitted use definitions for special exceptions in § 6-94. Section 6-95 makes no reference to special permitted uses under § 6-94. This is not surprising given that the examples of permitted accessory buildings listed in § 6-95 (a) (2) (a) includes "[p]rivate garages, barns, sheds, shelters, silos, and other struc-

tures *customarily accessory to residential estates, farms or resident uses . . . .*" (Emphasis added.) The permitted special exceptions under § 6-94 are exceptions expressly because they are unquestionably not residential. Thus, based on the clear language of the regulations, it is illogical to apply § 6-95 to § 6-94 uses such as Neighbor's proposed building.[8] Therefore, we conclude that § 6-95 does not apply to those additional uses permitted by special exception or special permit under § 6-94.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Church and the commission each have adopted the brief of Neighbor and have elected not to file their own briefs.

[2] As a result of preliminary discussions with the commission, Neighbor had agreed previously to move the building ten feet north; and slightly more than 100 feet from the southern boundary line.

[3] The letter specifically stated that its contents had been reviewed by members of the commission and that the letter reflected the commission's October 18, 2016 decision.

[4] When asked during oral argument what adverse impacts the plaintiffs believed were created by the closer location, the plaintiffs' attorney referenced one resident of Putnam Park who had stated that there would be asphalt where green grass used to be and his view of the Tomes-Higgins House would become obstructed.

[5] The commission observed that the proposed building would be 100 feet from the rear property line and 38.8 feet from the eastern property line, but that this would have no adverse impacts on the plaintiffs because the only part of the plaintiffs' facilities less than 100 feet from the proposed building would be the caretaker's office at Putnam Hill, which, according to the commission, has people coming and going throughout the day. The commission also found that the closer distance was acceptable, in part, because moving the building to the west would require the elimination of mature trees that are part of the landscape environment of the neighborhood, and that the proposed landscaping between 220 East Putnam Avenue and the plaintiffs' properties would work to screen any potential impacts of the proposed facility. The commission, in the exercise of caution, also placed a number of restrictions on the proposed Neighbor facility, including the hours of operation, the number and schedule of deliveries, the hours of lighting for the building and the exterior, no night time meetings or activities, the times of trash pickup and no change in the current location of the dumpster, and compliance with municipal noise regulations.

[6] Section 6-15 of the regulations, titled "standards," provides in relevant part: "(a) The [p]lanning and [z]oning [c]ommission may approve applications for preliminary site plans or deny applications for preliminary site plans according to the standards set forth in this [r]egulation. Alternatively, as a condition of approval, the [c]ommission may require such modifications of the proposed plans as it deems necessary to comply with [r]egulations. In determining whether to approve application for preliminary site plans, deny such applications, or approve such application with modifications, the [p]lanning and [z]oning [c]ommission shall take into consideration the public health, safety and general welfare and the comfort and convenience of the general public, taking into account whether the applicant has satisfied the following specific objectives:

"(1) Conformity of all proposals with the [p]lan of [d]evelopment. . . .

"(3) The protection of environmental quality and the preservation and enhancement of property values. At least the following aspects of the site plan shall be evaluated to determine the conformity of a site plan to this standard:

"(a) Adequacy of open spaces, screening and buffering between similar and dissimilar uses to assure light, air, privacy and freedom from nuisance or other disturbance.

"(b) The location, height and materials of walls, fences, hedges and plantings so as to ensure harmony with adjacent development, screen parking and loading areas, and conceal storage areas, utility installations and other such features, all in conformity with the requirements of [§] 6-176 of the

[b]uilding [z]one [r]egulations;

"(c) The prevention of dust and erosion through the planting of ground cover or installation of other surfaces;

"(d) The preservation of natural attributes and major features of the site such as wetlands, highly erodible areas, historic structures, major trees and scenic views both from the site and onto or over the site;

"(e) The conformity of exterior lighting to the requirements of [§§] 6-151 to 6-153 of the [b]uilding [z]one [r]egulations;

"(f) The design and arrangement of buildings and accessory facilities and the installation of proper shielding so as to minimize noise levels at the property boundary;

"(g) The provision of adequate storm and surface water drainage facilities to properly drain the site while minimizing downstream flooding, yet not adversely affect water quality as defined by the State Department of Environmental Protection.

"(4) A high quality of building design, neighborhood appearance, and overall site design. At least the following aspects of the site plan shall be evaluated to determine the conformity of a site plan to this standard:

"(a) A design in harmony with existing and/or proposed neighborhood appearance, as shown by the exterior appearance of the buildings, their location on the site, and their relationship to the natural terrain and vegetation and to other buildings in the immediate area. . . ."

[7] Section 6-17 (d) of the regulations provides in relevant part: "In reviewing special permits, the [p]lanning and [z]oning [c]ommission shall consider all the standards contained in [§] 6-15 (a). In granting any special permit the [c]ommission shall consider in each case whether the proposed use will:

"(1) Be in accordance with the [p]lan of [d]evelopment. . . .

"(11) Will not materially adversely affect residential uses, nor be detrimental to a neighborhood or its residents, nor alter a neighborhood's essential characteristics. . . ."

[8] Even if § 6-95 did apply, we agree with the defendants that Neighbor's proposed building is not an accessory use or building. Section 6-5 (a) (6) of the regulations, which sets forth the common definitions used in the regulations, provides: "Building Accessory or Accessory Use shall mean, in a residential zone, any accessory building or use *which is subordinate and customarily incidental to the principal building or use* on the same lot. In a commercial zone, shall mean any accessory building, including shipping containers or other structure customarily incidental to the principal building or use on the same lot." (Emphasis added.) In no way is Neighbor's proposed building subordinate and incidental to the Tomes-Higgins House and its associated carriage house.