******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# HIGH WATCH RECOVERY CENTER, INC. *v.*
# PLANNING AND ZONING COMMISSION
# OF THE TOWN OF KENT
## (AC 45972)

Prescott, Clark and Seeley, Js.*

*Syllabus*

The plaintiff appealed to this court from the trial court's judgment dismissing
its appeal from the decision of the defendant town planning and zoning
commission denying the plaintiff's special permit application to con-
struct a greenhouse on its farm property in Kent. Since 1939, the plaintiff
has operated a residential treatment program for individuals with sub-
stance abuse disorders, which includes a residential facility with an on-
site kitchen, on real property located across the street from the farm
property. In 2017, the plaintiff purchased the seventy acre farm property
that had been used for farming at the time the plaintiff purchased it.
Both the farm property and the residential property are located in the
town's rural residential district. The regulations for the rural residential
district in place at the time the plaintiff purchased the farm property
in 2017 permitted, subject to special permit review and approval, a
privately operated hospital, clinic, nursing home, or convalescent home.
In early 2018, the plaintiff filed with the defendant a special permit
application and a site plan application seeking approval to conduct
therapeutic activities on the farm property in conjunction with the resi-
dential treatment program, including equine therapy, a ropes course and
climbing wall, and a therapeutic agricultural program and accompanying
kitchen facility. The defendant subsequently approved the plaintiff's
applications for the farm property for therapeutic activities in conjunc-
tion with a privately operated hospital, clinic, nursing or convalescent
home or similar institution. In February, 2020, the town's zoning regula-
tions were amended to prohibit, by special permit, a privately operated
hospital, clinic, nursing home or convalescent home in the rural residen-
tial district. In August, 2020, the plaintiff applied for a special permit
to add a hoop house style greenhouse to the existing garden/pasture
area of the farm property in order to enhance its existing farming capac-
ity. The plaintiff's application stated, inter alia, that the use of a green-
house was consistent with its special permit application from 2018 and
that the intention of the use of the greenhouse was not to expand
its therapeutic work but to expand its capacity to provide fruits and
vegetables to the residential facility. After a public hearing, the defendant
denied the plaintiff's application, finding that the proposed greenhouse
was an impermissible expansion of a nonconforming use. The plaintiff
appealed to the Superior Court, claiming, inter alia, that the proposed
greenhouse was within the scope of the prior approved special use
permit issued to the plaintiff in 2018, that the greenhouse was a permissi-
ble intensification of that prior approved, but now nonconforming, thera-
peutic agricultural or farm use, and that the substantial evidence in the
record did not support the defendant's stated reasons for its denial. After
briefing and oral arguments, the court rendered judgment dismissing
the plaintiff's administrative appeal, concluding that the nonconforming
use of the farm property was limited to the precise terms of the 2018
special permit and the site plan that the plaintiff submitted in support
of its application for that permit and that the plaintiff could not, as a
matter of law, intensify the use of the farm property in accordance with
the test set forth in *Zachs* v. *Zoning Board of Appeals* (218 Conn. 324),
in which the Supreme Court set forth three criteria for determining
whether a valid nonconforming use of property has been permissibly
intensified or impermissibly expanded, including the extent to which
the current use reflects the nature and purpose of the original use, any
differences in the character, nature and kind of use involved, and any
substantial difference in effect upon the neighborhood resulting from
differences in the activities conducted on the property. The court also
held that a reasonable interpretation of the defendant's first stated rea-
son for its denial was that the greenhouse constituted an impermissible

expansion of the nonconforming use, that, even if the use of the farm property could have been intensified, the addition of a greenhouse to an approved special permit accompanied by a site plan that did not include a greenhouse would be an impermissible expansion rather than a permissible intensification, and that the defendant's first stated reason for the denial was supported by substantial evidence in the record. After a grant of certification, the plaintiff appealed to this court. *Held*:

1. The trial court erred as a matter of law in concluding that the plaintiff's valid nonconforming use of the farm property could not be intensified in accordance with the criteria set forth in *Zachs* because it arose from a special permit: the case on which the defendant primarily relied in claiming that the unique nature of special permits supported the court's conclusion that the plaintiff could not intensify its valid nonconforming use of the farm property that was approved by the 2018 special permit, *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission* (222 Conn. 607), did not involve a valid nonconforming use or discuss the interplay of a use approved by special permit and the important rights a property owner has in a use that later becomes nonconforming; moreover, a review of the case law addressing nonconforming uses led this court to conclude that a use approved by special permit may be intensified in accordance with the *Zachs* criteria, as the Supreme Court has made clear that the right to continue a valid nonconforming use includes a right to intensify that use, and to limit a valid nonconforming use to the exact specifications of a site plan that was submitted with the application for the special permit approving what subsequently becomes a valid nonconforming use would invade the constitutional guarantees of due process that brought the nonconforming principle into being; furthermore, the trial court's per se rule prohibiting any intensification of a valid nonconforming use that originated from a special permit on the basis that the special permit was approved in conjunction with a site plan, if accepted, would prohibit the intensification of any nonconforming use that arose from any of the host of other uses approved in conjunction with a site plan, including any activity designated in the regulations as requiring site plan approval, whereas the very nature of the analysis required under *Zachs*, on the other hand, ensures that any proposed intensification of a valid nonconforming use is consistent with the nature and scope of that nonconforming use, and, unlike a per se rule prohibiting the intensification of a use approved by way of a special permit, the *Zachs* approach balances an owner's protected interest in the reasonable use of his or her property with a local government's valid interest in ensuring that the property continues to be used in a manner that is consistent with the zoning regulations.

2. The trial court erred in concluding that there was substantial evidence in the record to support the defendant's finding that the addition of the proposed greenhouse would constitute an illegal expansion of the plaintiff's valid nonconforming use of the property:

a. On the basis of its review of the record, this court concluded that the use of the proposed greenhouse reflected the nature and purpose of the existing, original use of the farm property, given that it would be placed on the existing garden and pasture area on the farm property where plants were already grown, it would be in close proximity to the existing house and barn on the farm property, and it would permit the plaintiff to continue to grow fruits and vegetables in order to feed and support the residents and staff residing on the residential property, activities that it already performed.

b. This court concluded that the proposed greenhouse simply provided an improved and more efficient way to grow fruits and vegetables and to provide therapeutic agricultural services, and the fact that the greenhouse may have increased the fruit and vegetable yield already used to support the residents and staff on the residential property could not reasonably be said to involve differences in the character of the nonconforming use rather than increases in the volume of business within the scope of the original use; moreover, the defendant's argument that the addition of a structure to a nonconforming use was a per se change in the character of the use, constituting an illegal expansion, found no support in the case law, and, although some courts had concluded that the addition of a new structure or the expansion of an existing building constituted an illegal expansion of a nonconforming building or use, the legality of a proposed change to a nonconforming use was a fact intensive

inquiry that must be conducted on a case-by-case basis; furthermore, although a proposal to extend a nonconforming use into an additional season or seasons may, under certain circumstances, constitute an illegal expansion of the nonconforming use, the defendant relied on a highly technical and overly narrow characterization of the existing use of the farm property in support of its argument that the proposed greenhouse would impermissibly allow activities over a substantially additional period of the year, and this court could not conclude on the basis of the record that the addition of the greenhouse, which would simply allow the plaintiff to increase its fruit and vegetable yield, constituted an illegal expansion when the farm property was already being used year-round for related activities.

c. Contrary to the defendant's arguments, the plaintiff's proposed use of the greenhouse was consistent with the permitted as of right uses and accessory uses in the zoning district in which the farm property was located, and the relevant provisions of the town zoning regulations undercut the defendant's contention that there would be a substantial effect on the neighborhood by the use of the proposed greenhouse; moreover, there was no evidence in the record that the proposed greenhouse would be seen from the road, and, although the defendant made conclusory arguments on appeal suggesting that the greenhouse may be seen from the road and that the site plan showed that the proposed greenhouse would be quite close to surrounding properties, these arguments did not, without more, demonstrate that there would be a substantial effect upon the neighborhood; furthermore, although numerous neighbors spoke at the hearings held by the defendant and voiced their displeasure with the plaintiff's expansion in the town over the years, most of the statements were not specific to the application and site plan under consideration but, instead, constituted general grievances about the plaintiff and the construction on the residential property that the defendant had previously approved, and, because the comments by the neighbors amounted to general concerns, speculation, and mere worry, such comments did not qualify as substantial evidence and therefore provided little, if any, evidence concerning the proposal's effect on the neighborhood.

Argued September 21, 2023—officially released January 23, 2024

*Procedural History*

Administrative appeal from the decision of the defendant denying the plaintiff's special permit application to build a greenhouse on its property, brought to the Superior Court in the judicial district of Litchfield, where the court, *Hon. John W. Pickard*, judge trial referee, rendered judgment dismissing the plaintiff's appeal, from which the plaintiff appealed to this court. *Reversed*; *judgment directed*.

*Christopher J. Smith*, for the appellant (plaintiff).

*Michael A. Zizka*, for the appellee (defendant).

*Opinion*

CLARK, J. In this certified zoning appeal, the plaintiff, High Watch Recovery Center, Inc., appeals from the judgment of the Superior Court dismissing its administrative appeal. The plaintiff brought the underlying appeal to the Superior Court from a decision of the defendant, the Planning and Zoning Commission of the Town of Kent (commission), denying its special permit application that proposed the addition of a thirty foot by seventy foot greenhouse to its property located at 47 Carter Road in Kent. The commission denied the plaintiff's application because it determined that the plaintiff's proposed greenhouse was an illegal expansion, rather than a permissible intensification, of its valid nonconforming use of the property. On appeal, the plaintiff claims that the court erroneously concluded that (1) the plaintiff could not, as a matter of law, intensify its valid nonconforming use of the property because the intensification doctrine recognized by our Supreme Court in *Zachs* v. *Zoning Board of Appeals*, 218 Conn. 324, 332, 589 A.2d 351 (1991),[1] does not apply to a nonconforming use that arises out of a previously issued special permit and (2) the substantial evidence in the record supported the commission's determination that the plaintiff's proposed greenhouse was an illegal expansion of its valid nonconforming use. For the reasons that follow, we agree with the plaintiff and reverse the judgment of the Superior Court.

The following facts and procedural history are relevant to our resolution of this appeal. Since 1939, the plaintiff has operated a residential treatment program on real property known as 62 Carter Road in Kent (residential property) for individuals with substance abuse disorders. Located on the residential property is a seventy-eight bed residential facility that includes an on-site kitchen.

On June 23, 2017, the plaintiff purchased property located across the street from the residential property. That property is known as 47 Carter Road and is the subject of this appeal (property). The property spans approximately seventy acres and was used for farming up until the time the plaintiff purchased it in 2017. Both the property and the residential property are located in Kent's Rural Residential (RU-1) district.

Kent adopted zoning regulations for the first time in or about 1965. In the RU-1 district, the Kent Zoning Regulations (regulations) in place at the time the plaintiff purchased the property permitted, subject to special permit review and approval, "[a] privately operated hospital, clinic, nursing home, or convalescent home . . . ." Kent Zoning Regs., c. 3200, § 3224 (2018). Because the plaintiff had operated its residential treatment program on the residential property prior to the adoption of the regulations, the plaintiff was not

required to obtain a special permit for the residential property. To the extent the plaintiff wished to engage in such activities on the subject property located across the street from the residential property, however, the regulations required it to obtain a special permit.

In February, 2018, the plaintiff filed with the commission a special permit application and a site plan application seeking approval to conduct therapeutic activities on the property in conjunction with the treatment program that it operated on the residential property. The special permit application stated in relevant part: "[The plaintiff] has the opportunity to incorporate into its existing program additional therapies that have proven effective in the treatment of substance use disorders. These new therapies would include equine therapy, a ropes course and climbing wall, and a therapeutic agricultural program and accompanying kitchen facility. In fact, [the plaintiff] purchased the property as a working farm in part to continue its agricultural use. . . . The therapies at [the property] will be offered as part of the [plaintiff's] existing . . . treatment plan, not as a standalone program; the residents that participate in the therapies offered at [the property] will be the same residents living at the [residential property] across the street." In March, 2018, the commission adopted a resolution approving the plaintiff's applications for the subject property for "therapeutic activities in conjunction with a privately-operated hospital, clinic, nursing or convalescent home or similar institution . . . ."

On February 16, 2020, the regulations were amended to prohibit the plaintiff's addiction treatment services in the RU-1 district. Specifically, the amendment eliminated language from the regulations that permitted, by special permit, "[a] privately operated hospital, clinic, nursing home, or convalescent home . . . ." Compare Kent Zoning Regs., c. 3200, § 3224 (2018), with Kent Zoning Regs., c. 3200, § 3224 (2020).

On August 20, 2020, the plaintiff applied for a special permit to add a thirty foot by seventy foot "hoop house" style greenhouse[2] to the "existing [g]arden/pasture area" of the property. The plaintiff stated that it sought to add the greenhouse in order "to enhance [its] existing farming capacity." The application further stated, inter alia, that "[t]his is consistent with our special permit application from 2018 which stated, '[The plaintiff] purchased the property as a working farm in part to continue its agricultural use.' We remain true to that intention and we seek to further continue that pre-existing use. The intention of this application for a hoop house is not to expand our therapeutic work but to expand our capacity to provide fruits and vegetables to [the residential property]."

The commission held a public hearing on the plaintiff's special permit application on multiple days in September and October, 2020. On November 12, 2020, the

commission, by a vote of four to two, denied the plaintiff's application. The commission's stated reasons for its denial were as follows: "a. With regard to [§ 10440 (3)], which states: '*Whether the proposed use will have a detrimental effect on neighboring properties or the development of the district*', the [c]ommission finds that based on the representations made by the applicant, it is unclear whether or not this proposed structure and its use would increase the intensity of a use that is pre-existing, non-conforming as a result of its affiliation with the use of 62 Carter Road.

"b. With regard to [§ 10440 (11)], which states: '*Whether adequate provisions have been made to moderate or mitigate neighborhood impacts by limiting the intensity of use of the property (including, without limitation, such considerations as the area devoted to the use, the number of people involved in the use, the number of events or activities proposed, the hours of operation, etc.) or by modifying the location or configuration of the proposed use*', the [c]ommission finds that conflicting information indicates that the proposal could not meet the requirements of this section."[3] (Emphasis in original.)

Following the commission's denial of the plaintiff's application, the plaintiff appealed to the Superior Court. See General Statutes § 8-8 (b).[4] The plaintiff raised three claims. First, it claimed that the substantial evidence in the record established that the plaintiff's proposed greenhouse constituted a permitted accessory agricultural or farm use, as provided by the operative regulations. It therefore argued that a special permit was not actually required to construct its proposed greenhouse. Second, the plaintiff claimed that the proposed greenhouse was within the scope of the commission's prior approved special use permit that it issued to the plaintiff in 2018. Accordingly, the plaintiff argued that the greenhouse was a permissible intensification of that prior approved, but now nonconforming, therapeutic agricultural or farm use and that no special permit was required. Last, the plaintiff claimed that the substantial evidence in the record did not support either of the commission's stated reasons for its denial. The parties filed briefs and oral arguments were held by the court.

On July 5, 2022, the Superior Court, *Hon. John W. Pickard*, judge trial referee, issued a memorandum of decision dismissing the plaintiff's administrative appeal. The court rejected the plaintiff's first claim that the plaintiff did not need a special permit in order to construct and maintain the greenhouse because an agricultural or farm related greenhouse constitutes a permitted, as of right, farm use.[5]

The court also rejected the plaintiff's claim that the addition of its proposed greenhouse is a permissible intensification of its valid nonconforming use. The court concluded that the current nonconforming use of the

property is limited to the precise terms of the 2018 special permit and the site plan that the plaintiff submitted in support of its application for that permit and that the plaintiff could not, as a matter of law, intensify the property in accordance with the test set forth in *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 332. The court reasoned that "the plaintiff's use of the subject property was a permitted use in connection with their program but one which existed by special permit only. That special permit had its own terms. Those terms were that the property could be used for an agricultural or farm use as therapy for program participants. The approval of the special permit was accompanied by a site plan which did not include a greenhouse. . . . [T]his fact distinguishes this case from typical nonconforming use cases where the issue is whether the proposed use is an intensification or an expansion. The plaintiff is limited by the terms of the 2018 special permit and is not permitted to intensify that approved use. It would be very odd if the law permitted a special permit applicant to obtain a permit and site plan approval showing no buildings and [then] proceed to build a building on the grounds that it is merely a permissible intensification."

The court nevertheless went on to hold that a reasonable interpretation of the commission's first stated reason for its denial was that the greenhouse constituted an impermissible expansion of the nonconforming use. The court concluded that, even if the use of the property could have been intensified, "[t]he addition of a greenhouse to an approved special permit use without a greenhouse would be an impermissible expansion rather than a permissible intensification." The court also found that the commission's first stated reason for the denial was supported by substantial evidence in the record. See footnote 7 of this opinion.

On August 15, 2022, the plaintiff filed a petition for certification with this court requesting review of the Superior Court's July 5, 2022 decision dismissing its zoning appeal. See General Statutes § 8-8 (o); Practice Book § 81-1. On October 19, 2022, this court granted the plaintiff's petition. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The plaintiff first claims that the court erred as a matter of law in holding that the plaintiff's valid nonconforming use of the property may not be intensified in accordance with the criteria set forth in *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 332. In particular, the plaintiff claims that the court improperly concluded that a nonconforming use that arises from a special permit is forever limited to the strict terms of the special permit and the site plan that accompanied the special permit application. The plaintiff contends that it has a

vested and constitutionally protected right to intensify the use of its property notwithstanding the fact that its valid nonconforming use was initially approved by special permit. We agree with the plaintiff.

Whether the court applied the correct legal standard in determining whether the plaintiff could intensify its valid nonconforming use is a question of law over which our review is plenary. See *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, 176 Conn. App. 570, 586–87, 170 A.3d 73 (2017); *MacKenzie* v. *Planning & Zoning Commission*, 146 Conn. App. 406, 435, 77 A.3d 904 (2013).

We begin with a brief overview of the legal principles at play. "A nonconformity is a use or structure [that is] prohibited by the zoning regulations but is permitted because of its existence at the time that the regulations are adopted." *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 710, 535 A.2d 799 (1988). "For a use to be considered nonconforming . . . [it] must possess two characteristics. First, it must be *lawful* and second, it must be *in existence* at the time that the zoning regulation making the use nonconforming was enacted." (Emphasis in original.) *Helicopter Associates, Inc.* v. *Stamford*, 201 Conn. 700, 712, 519 A.2d 49 (1986).

Connecticut law recognizes and protects the right to continue valid nonconforming uses. Indeed, General Statutes § 8-2 (d) (4) provides in relevant part that municipal zoning regulations shall not "[p]rohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations . . . ." This means that a property owner has the right to continue "the same use of the property as it existed before the date of the adoption of the zoning regulations" that made the use nonconforming. *Helbig* v. *Zoning Commission*, 185 Conn. 294, 306, 440 A.2d 940 (1981). Our law therefore "precludes a municipality from amortizing or altogether eliminating such nonconformities through the enactment or amendment of its zoning regulations." *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 684, 111 A.3d 473 (2015).

A valid nonconforming use can arise in a number of different ways. For example, a valid nonconforming use of a property may arise when a property is used lawfully prior to the enactment of town zoning regulations. See, e.g., *Petruzzi* v. *Zoning Board of Appeals*, 176 Conn. 479, 482–83, 408 A.2d 243 (1979) ("[t]he lot and building in question" qualified as legally protected nonconforming uses because they were lawful and in existence prior to enactment of zoning regulations). Or, like in the present case, the zoning regulations could have permitted the use (e.g., by right or special permit), but a subsequent amendment to the regulations later made that permitted use nonconforming. See *Helicopter Associates, Inc.* v. *Stamford*, supra, 201 Conn. 712 ("[u]ntil the amendment was passed, heliports were

allowed under Stamford zoning regulations in the zone where the [property] is located"). Irrespective of how a valid nonconforming use comes into being, a property owner may continue the same use of the property as it existed prior to the enactment of zoning regulations making the use nonconforming.

Our appellate courts have recognized that "[t]he right to a nonconforming use is a property right and . . . any provision of a statute or ordinance which takes away that right in an unreasonable manner, or in a manner not grounded on the public welfare, is invalid. A lawfully established nonconforming use is a vested right and is entitled to constitutional protection." (Internal quotation marks omitted.) *Petruzzi* v. *Zoning Board of Appeals*, supra, 176 Conn. 483–84, citing 2 E. Yokley, Zoning Law and Practice (3d Ed. 1965) § 16-3, p. 219. A property owner's right to continue a nonconforming use, however, does not include a right to expand that use. See, e.g., *Parker* v. *Zoning Commission*, 209 Conn. App. 631, 655, 269 A.3d 157, cert. denied, 343 Conn. 908, 273 A.3d 694 (2022). Our courts have observed that "[z]oning regulations in general seek the elimination of nonconforming uses, not their creation or enlargement"; *Planning & Zoning Commission* v. *Craft*, 12 Conn. App. 90, 96, 529 A.2d 1328, cert. denied, 205 Conn. 804, 531 A.2d 937 (1987); and that "it is the indisputable goal of zoning to reduce nonconforming to conforming uses with all the speed justice will tolerate." (Internal quotation marks omitted.) *Woodbury Donuts, LLC* v. *Zoning Board of Appeals*, 139 Conn. App. 748, 761, 57 A.3d 810 (2012).

But not every change to a nonconforming use is an impermissible expansion. See, e.g., *Raymond* v. *Zoning Board of Appeals*, 76 Conn. App. 222, 257, 820 A.2d 275, cert. denied, 264 Conn. 906, 826 A.2d 177 (2003). Our Supreme Court has held, for instance, that, although a nonconforming use may not be expanded, it may be intensified. See *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 332–33. In *Zachs*, the court identified three criteria for determining whether a change to a nonconforming use constitutes a permissible intensification or an impermissible expansion: "(1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property." Id., 332.

With these principles in mind, we turn to the court's memorandum of decision in this case. The court concluded that the commission properly denied the plaintiff's application for a special permit to place a greenhouse on the subject property because the 2018 special permit and the site plan that accompanied the application for that permit did not include the proposed green-

house. The court held that the "current use of the subject property in accordance with the 2018 special permit is limited to the terms of the special permit and the site plan approved at the same time" and that "the current nonconforming use cannot be intensified in accordance with the *Zachs* standards."

The plaintiff claims that the court's conclusion is erroneous as a matter of law because it deprives it of the right to intensify its valid nonconforming use of the property. It claims that there is no precedent or valid rationale for excluding its property from the class of nonconforming uses that may permissibly be intensified solely because the nonconforming use was initially approved by a special permit. The commission counters that the nature of special permits supports the court's conclusion that the plaintiff may not intensify its valid nonconforming use of the property that was approved by the commission in 2018. The commission argues that, because the 2018 special permit application included a site plan, the plaintiff is precluded from using the property in a manner that would cause the property to differ from what was depicted in the initial site plan that was submitted with the approved special permit application.

In order to address the question before us, we begin with an overview of the statutes governing special permits. Section 8-2 (a) (3) provides in relevant part that municipalities may enact regulations that "provide that certain classes or kinds of buildings, structures or use of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values." This court has explained that a "function of a special permit is to allow a property owner to use his property in a manner expressly permitted under the zoning regulations, subject to certain conditions necessary to protect the public health, safety, convenience, and surrounding property values." (Internal quotation marks omitted.) *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission,* supra, 176 Conn. App. 585. Indeed, "[t]he basic rationale for the special permit [is] . . . that while certain [specially permitted] land uses may be generally compatible with the uses permitted as of right in particular zoning districts, their nature is such that their precise location and mode of operation must be regulated because of the topography, traffic problems, neighboring uses, etc., of the site." (Internal quotation marks omitted.) *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission,* 222 Conn. 607, 612, 610 A.2d 1205 (1992) (*Barberino Realty*), quoting T. Tondro, Connecticut Land Use Regulation (1979), p. 78.

It also is common for zoning regulations to require the submission of a site plan in conjunction with a special permit application, as the regulations required in the present case. See Kent Zoning Regs., c. 10300, § 10320 (2) (2020) ("[a] [s]ite [p]lan application shall be submitted . . . [f]or any activity designated in the [r]egulations as requiring [s]pecial [p]ermit approval"); see also *International Investors* v. *Town Plan & Zoning Commission*, 344 Conn. 46, 68–70, 277 A.3d 750 (2022) (discussing interplay between special permits and site plans). Our Supreme Court has explained one reason for this practice. "[B]efore the zoning commission can determine whether the specially permitted use is compatible with the uses permitted as of right in the particular zoning district, it is required to judge whether any concerns, such as parking or traffic congestion, would adversely impact the surrounding neighborhood. The commission, therefore, must be allowed to examine the suggested proposal closely. The details of the proposal are laid out in the site plan, which is a physical plan showing the layout and the design of the site of a proposed use . . . . It generally should indicate the proposed location of all structures, parking areas and open spaces on the plot and their relation to adjacent roadways and uses. . . .

"When considering an application for a special permit, the commission is called upon to make a decision as to whether a particular application . . . would be compatible with the particular zoning district, under the circumstances then existing. That determination can only be made after a thorough examination of the specific site plan submitted. . . . [R]eview of a special permit application is necessarily dependent on a thorough review of the proposed site plan because, in fact, the grant of the special permit is usually contingent [on] approval of the site plan." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission*, supra, 222 Conn. 613–14.

Once an agency approves a special permit, however, that "[a]pproval *confers a right*, albeit one that may be subject to conditions." (Emphasis added.) *International Investors* v. *Town Plan & Zoning Commission*, supra, 344 Conn. 69. The nature of that right once the specially permitted use becomes nonconforming has not been addressed thoroughly by our case law.

Pointing to *Barberino Realty*, the commission claims that the unique nature of special permits supports the court's conclusion that the plaintiff may not intensify its valid nonconforming use of the property that was approved by the 2018 special permit. Although we recognize that there are some unique features to the special permit process, we are not convinced that *Barberino Realty*, including its description of the special permit

process, compels the conclusion that a nonconforming use that was initially approved by special permit may never be intensified.

First, *Barberino Realty*, the case on which the commission principally relies, did not involve a valid nonconforming use or discuss the interplay of a use approved by special permit and the important rights a property owner has in a use that later becomes nonconforming. See *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission*, supra, 222 Conn. 614–15. The plaintiff in *Barberino Realty* had not commenced construction on the project approved by a special permit and therefore never used the property in accordance with the special permit. Id., 610. Instead, it returned to the commission several years after the special permit had been approved with an application for a revised site plan that materially altered the original proposal for its elderly housing project. Id. The plaintiff argued that, once a site plan has been approved in conjunction with a special permit application, any subsequent revision to the site plan is required to conform to the criteria set forth only in the site plan regulations rather than the special permit regulations. Id., 611.

On appeal to our Supreme Court, the court addressed "whether, after approval of such a permit and site plan, a subsequent revision to the site plan must conform to the zoning regulations governing approval of such a special permit." Id., 608. The court held that "any application to revise such a site plan must be evaluated in light of the conditions set out in the special permit regulations." Id., 614. The court reasoned that "a contrary holding would render a zoning commission helpless if a developer first obtained a special permit on the basis of a site plan that was particularly well suited to the neighborhood, but then decided to substitute for that site plan one that eradicated the very features that motivated the commission to grant the special permit. By allowing the commission to take into account all special permit zoning regulations when a developer seeks a revision to its site plan, the commission can further the purposes of a town's zoning regulations." Id., 615.

It is clear, therefore, that the court in *Barberino Realty* did not address the issue raised in this appeal: whether a nonconforming use initially approved by special permit may be intensified. That question requires a court to weigh the important property rights one holds by virtue of a valid nonconforming use with the important governmental interests identified in *Barberino Realty*.

A review of the case law addressing nonconforming uses leads us to conclude that a use approved by special permit may be intensified in accordance with the *Zachs* criteria. Our Supreme Court has made clear that the right to continue a valid nonconforming use includes

a right to intensify that use. See, e.g., *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 331–33. That is because certain changes to a nonconforming use fall within the scope of the valid nonconforming use. See *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 243, 662 A.2d 1179 (1995) ("we have recognized that certain changes in nonconforming uses represent permissible intensifications within the scope of the valid nonconforming use"). To limit a valid nonconforming use to the exact specifications of a site plan that was submitted with the application for the special permit approving what subsequently becomes a valid nonconforming use "would invade the constitutional guarantees of due process which indeed brought the nonconforming principle into being." (Internal quotation marks omitted.) *State* v. *Szymanski*, 24 Conn. Supp. 221, 225, 189 A.2d 514 (1962); see also *Upper Darby Township Appeal*, 391 Pa. 347, 353–54, 138 A.2d 99 (1958) ("[o]nce it is determined . . . that a nonconforming use existed, natural development and growth cannot be paralyzed by an overly-technical appraisement of the existing use").

Furthermore, *Zachs*, which is Connecticut's principal authority on whether a change is a permissible intensification of a nonconforming use or an illegal expansion of it, speaks broadly about nonconforming uses (irrespective of how the valid nonconforming use originated) and instructs courts to apply three criteria to help determine whether the activity in question is a permissible intensification or an impermissible expansion. See *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 332 ("[i]n deciding whether the current activity is within the scope of *a nonconforming use* consideration should be given to three factors" (emphasis added)). Our Supreme Court recently reiterated this requirement: "[W]hether a nonconforming use has been expanded . . . *requires application of the criteria* set forth in *Zachs* . . . ." (Emphasis altered.) *Pfister* v. *Madison Beach Hotel, LLC*, 341 Conn. 702, 728, 267 A.3d 811 (2022).

The Superior Court's per se rule prohibiting any intensification of a valid nonconforming use that originated from a special permit on the basis that the special permit was approved in conjunction with a site plan runs headlong into statutory and constitutional prohibitions. See General Statutes § 8-2 (d) (4); *Petruzzi* v. *Zoning Board of Appeals*, supra, 176 Conn. 483. Further, the court's holding, if accepted, would have far reaching ramifications for a host of other uses approved in conjunction with a site plan. Indeed, many other permissible uses under Kent's zoning regulations, as is true in other towns, require the submission of a site plan. Under the regulations, a site plan application is required "[f]or any activity designated in the [r]egulations as requiring [s]pecial [p]ermit approval"; "[i]n a residential zone, for any construction, development, expansion, or major

alteration of a multi-family use or any non-residential use"; "[i]n a non-residential zone, for any construction, development, expansion, or major alteration of any use including any alteration in site improvements such as parking, pedestrian or vehicle circulation, public utilities or reduction of landscaping"; and "[f]or any activity designated in the [r]egulations as requiring [s]ite [p]lan approval."[6] See Kent Zoning Regs., c. 10300, § 10320 (2020). The court's per se rule would prohibit the intensification of any nonconforming use that arose from any of these approvals, including "any activity designated in the [r]egulations as requiring [s]ite [p]lan approval." Id.

The very nature of the analysis required under *Zachs*, on the other hand, ensures that any proposed intensification of a valid nonconforming use is consistent with the nature and scope of that nonconforming use. In the case of a nonconforming use that was approved by way of special permit, *Zachs* requires a court to closely examine the terms of the special permit to determine the extent to which the change in use reflects the nature and purpose of the approved use, any differences in the character, nature and kind of use involved, and any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property. Unlike a per se rule prohibiting the intensification of a use approved by way of a special permit, the *Zachs* approach balances an owner's protected interest in the reasonable use of his or her property with a local government's valid interest in ensuring that the property continues to be used in a manner that is consistent with the zoning regulations. For these reasons, we conclude that a valid nonconforming use arising out of a previously issued special permit may be intensified in accordance with our Supreme Court's decision in *Zachs*.

II

Having concluded that a nonconforming use initially approved by way of a special permit may be intensified in accordance with *Zachs*, we must next determine whether there was sufficient evidence in the record to support the commission's stated reasons for its denial of the plaintiff's proposed greenhouse. The commission denied the plaintiff's special permit on the basis that the use of the proposed greenhouse would be an illegal expansion of the plaintiff's valid nonconforming use of the property.[7] The plaintiff claims that the court erred in concluding that there was substantial evidence in the record to support the commission's finding that the addition of its proposed greenhouse would constitute an illegal expansion of a nonconforming use. We agree with the plaintiff.

"In reviewing a decision of a zoning [commission], a reviewing court is bound by the substantial evidence rule, according to which . . . [c]onclusions reached by [a zoning] commission must be upheld . . . if they are

reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the [reviewing court] would have reached the same conclusion, but whether the record before the [commission] supports the decision reached." (Internal quotation marks omitted.) *McLoughlin* v. *Planning & Zoning Commission*, 342 Conn. 737, 751–52, 271 A.3d 596 (2022); see also *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 329–30 (board's finding that nonconforming use was illegally expanded is reviewed for "whether that finding is supported by substantial evidence"). "If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 427, 941 A.2d 868 (2008).

The "substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . The corollary to this rule is that absent substantial evidence in the record, a court may not affirm the decision of the board." (Internal quotation marks omitted.) *Putnam Park Apartments, Inc.* v. *Planning & Zoning Commission*, 193 Conn. App. 42, 54, 218 A.3d 1127 (2019). "When a zoning commission has stated a reason for denying a special permit application . . . the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations [that] the commission is required to apply under the zoning regulations." (Internal quotation marks omitted.) *McLoughlin* v. *Planning & Zoning Commission*, supra, 342 Conn. 752–53.

As previously explained, in *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 332, our Supreme Court held that "[i]n deciding whether the current activity is

within the scope of a nonconforming use consideration should be given to three factors: (1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property.”

We begin with the first *Zachs* criterion, which requires us to examine the scope of the use of the property at the time it became nonconforming in order to determine whether the proposed greenhouse reflects the nature and purpose of the original use. The evidence reveals that, in 2018, the commission adopted a resolution approving the plaintiff’s special permit application for “therapeutic activities in conjunction with a privately-operated hospital, clinic, nursing or convalescent home or similar institution.” It is undisputed that the plaintiff’s 2018 application sought to use the property for therapeutic and agricultural purposes, including for the operation of an equine therapy program; a ropes course and climbing wall; and various agricultural activities, including a therapeutic agricultural program. The activities proposed for the property were intended to support the residents residing on the residential property.

Following the approval of the plaintiff’s 2018 special permit application, the uncontroverted evidence reveals that the plaintiff began using the property in conformity with its approved special permit application by operating an equine therapy program, which included the use of a barn on the property to house the program’s horses; a ropes course and climbing wall; and agricultural activities, including the farming of vegetables and a horticulture therapy program for some of the residents of the treatment program. Much of the farming of vegetables on the property and the care of the horses for the equine program was done by the plaintiff’s staff. Some residents living on the residential property also assisted with the agricultural activities as part of their therapy program. The vegetables produced on the property were used to feed the residents and staff on the residential property.

The parties do not dispute that the use approved by the 2018 special permit became a valid nonconforming use in 2020 after the amendment to the regulations eliminating language that permitted “[a] privately operated hospital, clinic, nursing home, or convalescent home” in the RU-1 district. Although the plaintiff claims that a property owner may permissibly intensify a valid nonconforming use of its property as of right without approval from the commission, the record reflects that the plaintiff nevertheless filed a special permit application and a site plan application with the commission in 2020 seeking approval to add a greenhouse on the property. Thus, the plaintiff’s 2020 special permit appli-

cation and site plan essentially amounted to a prophylactic request for an order from the commission confirming that its use of its proposed greenhouse would be considered a permissible intensification of its valid nonconforming use.

The evidence from the record before the commission shows that the plaintiff proposed adding a "hoop house" style greenhouse. The hoop house would consist of a series of hoops covered with plastic that creates a tunnel in which plants could be grown. Because the ground on which the plaintiff proposed to construct the greenhouse is already flat, there would be no need for concrete work or any excessive ground disturbance. The plaintiff's representative explained at the hearing before the commission that the plaintiff only proposed putting down some stone dust or pea gravel to make walking more comfortable. There would be no bathrooms or habitable space in the hoop house. The plaintiff proposed that a water line and electrical connection be continued from the adjacent, preexisting barn on the property to the hoop house in order to water the plants.

On the basis of our review of the record, we conclude that the use of the proposed hoop house reflects the nature and purpose of the existing, original use of the property. The proposed thirty foot by seventy foot hoop house on the plaintiff's approximately seventy acre property would be placed on the existing farm garden and pasture area on the property where plants are already grown. The greenhouse also would be in close proximity to the existing house and barn on the property and close to the previously approved equine activities, ropes course, and wall climbing areas. The greenhouse would permit the plaintiff to continue to grow fruits and vegetables in order to feed and support the plaintiff's residents and staff residing on the residential property—activities that it already does.

We next consider the second *Zachs* factor, which requires us to consider any differences in the character, nature and kind of use involved. The plaintiff proposes to add a single, rudimentary hoop house to an area already devoted to growing plants. The proposed hoop house simply provides an improved and more efficient way to grow fruits and vegetables and to provide therapeutic agricultural services. See *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 334 ("[t]he fact that improved and more efficient instrumentalities are utilized in pursuit of the use does not exclude it from the category of an existing use, provided these are ordinarily and reasonably adapted to make that use available to the owner, and the original nature and purpose of the undertaking remain unchanged" (internal quotation marks omitted)). The fact that the hoop house may increase the fruit and vegetable yield already used to support the residents and staff on the residential property "cannot reasonably be said to involve differences

in the character of the nonconforming use rather than increases in the volume of business within the scope of the original use." Id., 332–33.

The commission makes two arguments in support of its position that the plaintiff's proposed hoop house constitutes a change in the character of its nonconforming use and, therefore, constitutes an illegal expansion. First, the commission contends that the addition of a structure to a nonconforming use is a per se change in the character of the use, asserting that "[t]he [c]ommission has not found any case in which a court has held that the addition or expansion of a structure for a nonconforming use may be deemed to be a mere intensification." Second, it claims that the addition of the hoop house constitutes a change in character because it would allow, for the first time, the plaintiff to grow fruits and vegetables into the winter season. We are not persuaded by the commission's arguments.

First, the commission's contention that the addition of any structure to a nonconforming use is a per se illegal expansion finds no support in our case law. Although it is true that some courts have concluded that the addition of a new structure or the expansion of an existing building constituted an illegal expansion of a nonconforming building or use, the legality of a proposed change to a nonconforming use is a fact intensive inquiry that must be conducted on a case-by-case basis. See, e.g., *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 708, 784 A.2d 354 (2001) ("[t]he legality of an extension of a nonconforming use is essentially a question of fact" (internal quotation marks omitted)).[8]

Second, although a proposal to extend a nonconforming use into an additional season or seasons may, under certain circumstances, constitute an illegal expansion of the nonconforming use; see, e.g., *Planning & Zoning Commission* v. *Craft*, supra, 12 Conn. App. 99; the commission in this case relies on a highly technical and overly narrow characterization of the existing use of the property in support of its argument that the proposed greenhouse would impermissibly allow activities over a substantially additional period of the year. The plaintiff's approved use of the property is not limited to vegetable farming. It is broader than that. It includes use of the property for therapeutic and agricultural purposes, including for the operation of an equine therapy program; a ropes course and climbing wall; and various agricultural activities, including a therapeutic agricultural program. The 2018 special permit did not purport to limit these activities to the time of year during which vegetables may be grown outdoors and the commission does not contend that all of the plaintiff's lawful activities on the property since the issuance of the special permit have been confined to that period of time. See id., 100 (preexisting use "extended to every period of the year, through winter, spring, summer and fall"

and, thus, increase in use was not illegal expansion or extension). We cannot conclude, on the record before us, that the addition of the hoop house, which will simply allow the plaintiff to increase its fruit and vegetable yield, constitutes an illegal expansion when the property is already being used year-round for related activities. See *Helicopter Associates, Inc.* v. *Stamford*, supra, 201 Conn. 716 ("a mere increase in the amount of business done pursuant to a nonconforming use is not an illegal expansion of the original use").

That brings us to the final *Zachs* criterion: whether there would be a substantial difference in effect upon the neighborhood resulting from the use of the plaintiff's proposed hoop house. The commission first claims that there "was substantial testimony from neighbors about the negative impacts the plaintiff's existing traffic had already caused." Second, it argues that, although the plaintiff claims that the hoop house would be at least 1000 feet from the road and completely invisible to passersby, the plaintiff offered no photographs or other visual demonstrations. Third, the commission claims that the proposed hoop house would be "quite close" to surrounding properties. We conclude that there is not substantial evidence to support the commission's contentions.

First, the plaintiff's proposed use of the hoop house is consistent with the permitted as of right uses and accessory uses in the RU-1 district. For example, the regulations already permit as of right (with no additional zoning authorization required) the principal use of "[a]griculture/farm in accordance with generally accepted agricultural practices as promulgated by the Connecticut Department of Agriculture." Kent Zoning Regs., c. 3200, § 3221 (1) (2020). "Farm" is defined as "[l]and used primarily for agricultural activities including . . . farm buildings and accessory buildings thereto including barns, silos, *greenhouses*, *hoop-houses* and other temporary structures or other structures . . . ." (Emphasis added.) Kent Zoning Regs., c. 2200 (2020). The regulations also permit as of right various accessory uses, including, inter alia, "[a]gricultural uses accessory to a residence such as . . . [g]ardening and the raising of crops or fruit," "[a]gricultural uses accessory to a farm," and "[a]n accessory use not listed [in the regulations]" if "such use is customarily incidental and directly related to the permitted principal use" and "no part of the accessory use is located in the area between the principal building and a public street unless visually screened from the view from the street and from adjacent premises." Kent Zoning Regs., c. 3200, § 3231 (2020). These provisions undercut the commission's contention that there would be a substantial effect upon the neighborhood from the plaintiff's use of the proposed hoop house.

Second, there is no evidence in the record that the

proposed hoop house would be seen from the road. Although the commission claims that the plaintiff did not provide any photographs or visual demonstrations, the plaintiff did submit a brochure for its proposed hoop house, which included numerous photographs of the type of greenhouse it wished to construct. It also submitted a site plan showing the proposed location of the hoop house. The plaintiff's application to the commission represented that the hoop house would be more than 1000 feet from the road. At the hearing, Vincent Roberti, Jr., the plaintiff's representative, testified that he used "Google Earth," an Internet mapping program, to plot the proposed hoop house, stating, inter alia, that "[i]t's not visible at all from Carter Road." Although the commission makes conclusory arguments on appeal suggesting that the hoop house may be seen from the road and that the site plan shows that the proposed hoop house would be "quite close" to surrounding properties, these arguments do not, without more, demonstrate that there would be a substantial effect upon the neighborhood.

Finally, although numerous neighbors spoke at the hearings and voiced their displeasure with the plaintiff's expansion in Kent over the years, most of the statements were not specific to the application and site plan under consideration but, instead, constituted general grievances about the plaintiff and the construction on the residential property that the commission had previously approved.[9] See *McLoughlin* v. *Planning & Zoning Commission*, supra, 342 Conn. 763 ("in the absence of specific evidence about the detrimental effects of the proposed facility, a generalized 'not in my backyard' . . . reaction cannot, by itself, serve as substantial evidence for denying the plaintiffs' application" (footnote omitted)). Indeed, a review of the comments by the neighbors shows that they amounted to "general concerns, speculation, and mere worry," which do not qualify as substantial evidence. Id., 760; see also *American Institute for Neuro-Integrative Development, Inc.* v. *Town Plan & Zoning Commission*, 189 Conn. App. 332, 349–50, 207 A.3d 1053 (2019) ("[P]ublic testimony is not to be considered substantial evidence when it is not supported by anything other than speculation and conjecture on the part of those objecting to the [party's] proposed activities. . . . While the commission could take into consideration the neighbors' concerns and observations as to current road conditions, the neighbors' remarks as to the adequacy of the streets to accommodate traffic and prospective hazards or congestion addressed matters of professional expertise." (Citations omitted; internal quotation marks omitted.)). The comments by the neighbors therefore provided little, if any, evidence concerning the proposal's effects upon the neighborhood.

In sum, the commission did not have substantial evidence before it to support its reasons for denying the

plaintiff's application. Consequently, the only reasonable conclusion for the commission was to grant the application with reasonable conditions. See *American Institute for Neuro-Integrative Development, Inc.* v. *Town Plan & Zoning Commission*, supra, 189 Conn. App. 353.[10]

The judgment is reversed and the case is remanded to the Superior Court with direction to sustain the plaintiff's appeal and to remand the case to the commission with direction to approve the plaintiff's application for a special permit application with reasonable conditions.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 324, our Supreme Court identified three criteria for determining whether a nonconforming use has been permissibly intensified or impermissibly expanded: "(1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property." Id., 332.

[2] The parties and the trial court use the terms "greenhouse" and "hoop house" interchangeably. As we discuss in greater detail later in this opinion, the type of greenhouse the plaintiff proposed to construct is commonly referred to as a "hoop house." A hoop house consists of a series of hoops covered with plastic that creates a tunnel in which plants can be grown. We, like the parties and the trial court, employ the terms "greenhouse" and "hoop house" interchangeably in reference to the plaintiff's proposal.

[3] Chapter 10400, § 10440, of the zoning regulations sets forth eleven factors that the commission is required to evaluate when considering a special permit application. See Kent Zoning Regs., c. 10400, § 10440 (2020). The regulations recognize that the commission may determine that some factors may not be applicable to certain types of applications. Id. The commission denied the plaintiff's application citing to § 10440 (3), titled "Overall Neighborhood Compatibility," and § 10440 (11), titled "Mitigation." See id. The commission did not make reference to the other nine factors.

[4] General Statutes § 8-8 (b) provides in relevant part: "Except as provided in subsections (c), (d) and (r) of this section and sections 7-147 and 7-147i, any person aggrieved by any decision of a board, including a decision to approve or deny a site plan pursuant to subsection (g) of section 8-3 or a special permit or special exception pursuant to section 8-3c, may take an appeal to the superior court for the judicial district in which the municipality is located, notwithstanding any right to appeal to a municipal zoning board of appeals under section 8-6. . . ."

[5] The plaintiff does not challenge that determination on appeal.

[6] The regulations require as part of an application for a general zoning permit certain "plans and/or other information." Kent Zoning Regs., c. 10100, § 10120 (2) (2020). For example, "[a] sketch plan may be submitted with the [z]oning [p]ermit application for all single-family and two-family dwellings, and for additions, or accessory buildings and structures, and accessory uses thereto except that, if the [z]oning [e]nforcement [o]fficer finds that a sketch plan does not provide sufficient information to determine whether the proposed building, structure or use would comply with these regulations, he or she may require the submission of a site plan or survey, prepared, signed and sealed by a Connecticut licensed land surveyor." Id., § 10120 (2) (c). Additionally, "[a] site plan or survey shall be required for any exterior alteration, renovation or improvement of existing commercial, industrial or campground premises or facilities and for any other proposed structure or use other than those for which a sketch plan may be provided." Id., § 10120 (2) (a).

Further, in Kent's Village Commercial District, site plan approval is required for "[r]etail stores"; "[r]estaurants"; "[b]akeries, delicatessens, ice cream parlors, coffee shops and similar food retail and serving establishments"; "[f]armers market"; "[a]rtists' studio and/or art gallery"; "[p]ersonal service establishments including but not limited to nail salons, day spas,

yoga studios, barber shops, beauty shops"; "[o]ffices"; "[b]anks and other financial institutions"; "[m]edical or dental offices or out-patient clinics"; "[h]ousehold service establishments including but not limited to plumbing or electrical stores"; "[m]ixed residential and commercial use within the same building"; and "[a]n accessory residential unit (attached) in accordance with Section 6200." Kent Zoning Regs., c. 4100, § 4123 (2020). These are only a few examples of the kinds of activities that require the submission of a site plan in Kent.

[7] Before the Superior Court, the commission argued that, although its reasons for denial were " 'perhaps inelegantly stated,' " they were " 'consistent with the notion that the plaintiff was proposing an unlawful expansion of a nonconforming use.' " See footnote 3 of this opinion. The court agreed with the commission that a reasonable interpretation of the commission's first reason for denial was that the plaintiff's proposed greenhouse was an impermissible expansion of a valid nonconforming use. The court indicated that, in light of its conclusion, it did not need to address the commission's second stated reason for denial. Upon our review, however, it is clear that the commission's first and second reasons for denial must be read together, as they both are based on the commission's conclusion that the plaintiff was proposing an unlawful expansion of its valid nonconforming use. Indeed, in its briefing before the trial court, the commission acknowledged that both of its stated justifications for denial were predicated on its determination that the greenhouse was an impermissible expansion.

[8] We note that at least one Superior Court has concluded that the addition of a structure to a nonconforming use was a permissible intensification of that use. See *Laviana* v. *Zoning Board of Appeals*, Docket No. CV-95-055119-S, 1996 WL 761474, *1, 4 (Conn. Super. November 26, 1996) (proposed construction of 28 foot by 100 foot pole barn on property was permissible intensification of nonconforming lumber yard); but see *McKosky* v. *Planning & Zoning Commission*, Docket No. CV-13-6039112-S, 2014 WL 6996359, *1, 16 (October 31, 2014) (site plan application seeking approval for construction of large " 'staging and storage area and structure' " to be used for " 'existing trucking and hauling business' " was illegal expansion of nonconforming use).

[9] For example, the members of the public commented that the plaintiff is an "omnivorous beast that just won't stop" and that it was time "to stop feeding the High Watch . . . beast"; "Why load up Kent. Uh it's enough. Let them go somewhere else. . . . It's a different neighborhood than when . . . they came in 1939 when there were no houses. Now there are many houses. Um somebody has to be firm with these people; if you're not firm they are going to be back to you time and again and they'll be well represented by legal people and they'll continue what they do. So, my point is let's stop them now. Let them go somewhere else for their expansion and live happily ever after in Kent"; the plaintiff "belong[s] in a bigger town because to have [the plaintiff] now building on two sides of Carter Road is setting a precedent that [is] really going to be horrible for the road"; the plaintiff is a "Trojan horse"; "[s]o we know that they are in the middle of building new beds [on the residential property] and the construction and the trucks and the coming and going; it used to be peaceful, charming, family oriented; now it's busy, highly trafficked, a noisy commercial area"; and "[t]hey've been building [on the residential property] for a long time now. It looks like a big gravel pit and now they are going to start building and tearing up the other side of the road . . . ."

[10] Although we conclude that the proposed hoop house constitutes a permissible intensification under *Zachs*, we note that, in addition to permissible intensifications, "[s]ome jurisdictions recognize a right to expand a nonconforming use, despite the general rule that such expansion is not permitted, to allow for the natural development and growth of the nonconforming use. This right has been called the 'natural expansion doctrine' and permits the augmentation of a nonconforming business use to meet the demands of normal growth. Under the doctrine, a nonconforming use may be extended in scope, as the business increases in magnitude, over ground occupied by the owner of the business at the time of the enactment of the zoning ordinance. The doctrine gives a landowner the right to expand the nonconforming use as required to maintain economic viability or to take advantage of increases in trade. Natural expansion, however, is subject to limitation where the expansion is inconsistent with the public interest, or the imposition of limitations is necessary to prevent excessive expansion, and a municipality thus may impose reasonable restrictions on the natural expansion of a nonconforming use. Furthermore, a natural expansion must not be substan-

tial, and it cannot be in actuality an addition of a new use rather than the expansion of an old one." (Footnotes omitted.) 83 Am. Jur. 2d 549–50, Zoning and Planning § 559 (2023); see also *Bauer* v. *Waste Management of Connecticut, Inc.*, supra, 234 Conn. 241 (referencing natural expansion doctrine); *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, 225 Conn. 731, 745, 626 A.2d 705 (1993) (same). Because neither party raised or briefed the doctrine of natural expansion in this appeal, we leave for another day the question of whether or to what extent that doctrine applies in Connecticut.

---